and has lost in all about 5½ months' time. He testified that his foot still pained him when at work.

Considering plaintiff's pain and suffering, loss of time, medical expenses, and the impairment, although temporary, of the free use of his foot, we think an allowance of $1,500 as damages reasonable.

It is therefore ordered that the judgment appealed from be reversed, and it is now ordered that the plaintiff, Charles A. Damonte, do have and recover of the defendant, Oliver Patton, the full sum of $1,500, with legal interest from the date of this decree, and all costs of suit in both courts.

(43 South. 155.)

No. 16,291.

McFARLAIN v. JENNINGS–HEYWOOD OIL SYNDICATE et al.

(Jan. 21, 1907. Rehearing Denied Feb. 18, 1907.)

1. WATERS AND WATER COURSES — SURFACE WATERS—ADJOINING OWNERS—LIABILITIES.

Under the provisions of article 660 of the Civil Code, the servitude of drain due by the estate below is confined to the reception of waters which run naturally from the estate above, and the proprietor of the estate above is prohibited from doing anything whereby this natural servitude may be rendered more burdensome. It follows, from the plain text of the article, that the proprietor of the estate above has no legal right to discharge into a natural drain the waste oil and salt water proceeding from wells sunk on his premises, and is responsible for the resulting damages to the estate below.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 58.]

2. SAME—PERSONS LIABLE.

Where an oil syndicate claims the ownership of all the waste oil on the field, and diverts the mixed oil and salt water by ditches into a natural drain, closed by a dam, for the purpose of separating and saving the oil, the syndicate is responsible for all the actual damages occasioned to the estate below by the escape of salt water and oil over or through the dam.

3. APPEAL — REVIEW — QUESTIONS OF FACT — DAMAGES.

Where the evidence is contradictory, and the quantum of damages depends on the esti-mates of witnesses, their assessment by the trial judge will not be disturbed on appeal, unless found to be manifestly erroneous.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 3983–3989.]

(Syllabus by the Court.)

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Philip Sidney Pugh, Judge.

Action by William L. McFarlain against the Jennings-Heywood Oil Syndicate and others. From a judgment in favor of defendants, plaintiff and defendant named appeal. Affirmed.

Chappuis & Holt, for appellant Jennings-Heywood Oil Syndicate and appellees Jennings Oil Co. and Heywood Bros. Ogden & Robira, for appellant McFarlain. Carlton & Proctor and Pujo, Moss & Sugar, for appellees Heywood Oil Co. and Bass & Benckenstein. Medlenka & Taylor and J. H. Heinen for appellees Northern Oil Co. and Southern Oil Co.

LAND, J. This is a suit against nine corporations and three partnerships, all operators in the Jennings Oil Field, to recover of them in solido damages in the sum of $30,050. There was judgment against the Jennings-Heywood Oil Syndicate for $1,000 with interest and costs, from which it appealed, and judgment in favor of the other defendants rejecting plaintiff's demand as against them. The plaintiff also has appealed from the judgment as an entirety. So the whole case is before us.

Plaintiff for a number of years has owned a farm of 167 acres, consisting of arable and swamp land, contiguous to and south of the Jennings Oil Field. A large coulée or natural drain, after running through the said oil field, traverses the land of the plaintiff, who complains that between August 31, 1904, and August 31, 1905, the defendants negligently permitted oil and salt water to escape from their wells, tanks, and pipe lines in great

quantities, and to flow through said coulée upon his lands to his great damage and injury. Plaintiff charges that the said syndicate, with the consent of the other defendants, constructed a system of canals, drains, and dams for the purpose of catching and saving waste oil, and in the course of its operations negligently allowed oil to escape, especially during and after rains, and permitted salt water also to escape through sluices in the dam, with the result that such oil and water flowed over the lands of the plaintiff, killing his trees, destroying his crops and pasturage, and polluting the fresh water running down the coulée. Plaintiff further complains that in May, 1905, the oil thus escaping, and finding lodgment on his lands, caught fire and caused the destruction of many thousands of trees, standing and fallen, many cords of wood, many logs, and much fencing and other property. Plaintiff claims $20,050 damages to property, and $10,000 punitory damages.

Defendants pleaded the general issue and the prescription of one year and estoppel. Their counsel also contend that the damage, if any, is "damnum absque injuria." They further argue that plaintiff neither alleged nor proved concert of action. Hence it is not entitled to a judgment in solido, and that there can be no judgment against the parties individually, because there is nothing to measure the liability of each.

The Jennings Oil Field was discovered in 1901, but during the year the production was small. Oil mixed with salt water was first produced in 1902, and the production of both rapidly increased from year to year. The greater production was during the year ending September 1, 1905. In September, 1904, the syndicate constructed the ditches and dam referred to in the petition for the purpose of draining the entire field and saving the waste oil. The syndicate claimed ownership of all the waste oil escaping from the wells, ditches, and tanks of the other opera-

tors, on the ground that it was the proprietor of "the surface rights" of the territory. This waste oil was mixed with a large quantity of salt water, the flow of which carried the oil through the lateral ditches into and down the coulée to the dam, at or near which most of the oil was separated and saved. The salt water thus impounded was released through the sluices of the dam, and all of it, mixed with such oil as could not be saved, went down the coulée through and upon lands of the plaintiff. When the rains were heavy, the overflow of the waters carried nearly all the waste oil then on the field over the dam and into the coulée.

That the plaintiff has suffered actual damages to his rights of property by the flow of oil and water, as stated above, is not denied, but the first defense is that the injurious result is "damnum absque injuria." This contention is predicated necessarily on the assumption that there exists a servitude of drain for oil and salt water on the lower estate in favor of the oil field above. The servitude of drain arises from the natural situation of places, and its extent is thus defined:

"It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.

"The proprietor below is not at liberty to raise any dam or to make any other work, to prevent this running of the water.

"The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome."
Civ. Code, art. 660.

This servitude is confined to waters that run naturally from the estate above. The text of the law excludes a service of drain created by the industry of man. That oil and salt water extracted by the labors of man from the bowels of the earth, and whose natural flow, if any, is a thousand or more feet beneath the surface, do not come within the purview of the article of the Code cited is too plain for argument; and no useful pur-

pose can be subserved by consulting the judge-made laws of other jurisdictions on the same subject-matter.

Having extracted oil and water from the earth, the operators assumed the burden of confining or taking care of it in such a manner as to prevent injury to the adjoining proprietors. By claiming the waste oil as owner, the syndicate assumed this burden, and absolved the other operators from responsibility in the premises. Hence there is no difficulty in fixing the liability, if any, on the syndicate.

The plea of estoppel is bottomed on the facts that the plaintiff leased eight acres of land for oil tankage purposes, that two tanks were erected thereon by the lessee, and that some oil escaped and flowed into the coulée below the dam. The plaintiff testified that the lease was made on the express condition that no oil should be permitted to escape on his land. On this state of facts the most that can be said is that some damage may have resulted, and that some deduction should be made on this ground.

The only really difficult question in the case is as to the quantum of damages which should be assessed against the syndicate.

The total amount of damages claimed is beyond all reason. The whole farm was worth probably not more than $5,000 or $6,000. The estimate of the witnesses run from $25 to $40 per acre for agricultural purposes, and there is no evidence to show that it is oil or mineral land. A solitary "duster" well driven in 1901 or 1902 indicates the contrary. The origin of the fire of May, 1905, is not disclosed. The most that can be said is that the oil in and around the coulée may have added fuel to the flames. There is nothing to show that the oil was the proximate cause of the alleged damage from fire. Some independent agency must have intervened to start the fire, which was some distance from the oil field.

The evidence shows that the plaintiff suffered damage to his property by the flow of oil and salt water in 1903 and 1904 prior to August 31st. This damage must be excluded as ultra petitum and as barred by the prescription of one year. The evidence, however, shows that the outflow from August 31, 1904, to August 31, 1905, was heavier than it was during any previous year. The damage was continuous and cumulative, and it is difficult to estimate the quantum for any particular period. The plaintiff testified that he was not damaged much prior to August 31, 1904, not as much as he was in the year immediately following. The civil engineer employed by defendants testified that 14.07 acres on one tract and 46.05 acres on another were badly damaged by fire, oil, and salt water, including 44 acres of timber which was killed. The 37 acres of woods in the swamp, covered most of the time with water, could hardly have been burned. The plaintiff testified that it was not, and the civil engineer said that most of the timber in this swamp was dead before the fire in May, 1905. The testimony is very conflicting as to quantity and value of the timber which was killed. The district judge, who heard the witnesses, awarded the sum of $1,000 as damages, without specifying the items. This allowance is equivalent to about $20 per acre for the area injuriously affected. Plaintiff proved no definite amount of damages arising from the alleged pollution of the water of the coulée. After a perusal of the voluminous transcript, we are not prepared to say that the award for damages is excessive or insufficient. The evidence is conflicting and unsatisfactory as to the quantum of damages sustained; but the injury was substantial, and the allowance is reasonable and conservative in amount. When the evidence is contradictory, the assessment of damages will not be disturbed, unless manifestly erroneous. It is hardly necessary to

add that the claim of $10,000 for damages for the alleged pollution of the waters of the coulée is so grossly exaggerated as to be fictitious in character, and that the demand for $10,000, as exemplary or punitive damages, is without any foundation whatever.

Judgment affirmed; costs of appeal to be equally divided between the two appellants.