357 So.2d 1305 (1978)
Douglas FOWLER et al., Plaintiffs-Appellees,
v.
WESTERN UNION TELEGRAPH CO. et al., Defendants-Appellants.
No. 6427.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1978.
Writ Refused June 2, 1978.
*1306 Breazeale, Sachse & Wilson, by Maurice J. Wilson, Baton Rouge, for defendants-appellants.
Kelly & Ware, Donald G. Kelly and Robert L. Salim, Natchitoches, Boagni & Genovese, by James T. Genovese, Opelousas, for plaintiffs-appellees.
O'Keefe, O'Keefe & Berrigan, by E. John Litchfield, New Orleans, for int. appellee.
Before WATSON, GUIDRY and FORET, JJ.
GUIDRY, Judge.
Douglas Fowler, his wife, Abbie Fowler and Fred Schlesinger sustained personal injuries in a vehicular collision which occurred on December 4, 1975 when their automobile driven by Mr. Schlesinger, was struck head-on by a vehicle being operated by an employee of defendant, Western Union Telegraph Company (Western Union). Mrs. Fowler died on July 20, 1976 from severe personal injuries and complications attributable to the accident.
In this suit, Douglas Fowler seeks recovery for personal injuries and medical expenses as well as damages for the wrongful death of his wife and for her conscious pain and suffering from the time of the accident until her death.
Jerry Fowler and Douglas Fowler, Jr., the adult children of Douglas and Abbie Fowler, seek damages for the wrongful death of their mother and for her conscious pain and suffering from the date of injury until her death.
Fred Schlesinger seeks recovery for personal injuries, medical expenses, lost wages and loss of sick leave incurred as a result of the accident.
Houston General Insurance Company (Houston General), the workmen's compensation insurer of the State of Louisiana, intervened in the suit, alleging that Douglas Fowler and Fred Schlesinger were engaged in the course and scope of their employment with the State of Louisiana at the time of the accident. Houston General further alleged payment of certain benefits and medical expenses in the amount of $7,956.16 to Douglas Fowler and $971.00 to Fred Schlesinger, and prayed that it be allowed recovery of these sums, together with any additional sums that may be paid in the future, by preference and priority out of any judgment awarded in favor of these plaintiffs.
Western Union admitted liability, leaving only the issue of quantum to be decided by the trial court.
The parties stipulated to Houston General's subrogation rights to the aforementioned sums as set forth above. Plaintiffs' medical expenses were also stipulated to be as follows:

*1307
 Mrs. Abbie Fowler ----------- $67,565.58
 Douglas Fowler -------------- 4,016.75
 Fred Schlesinger ------------ 2,588.91

Following a trial limited to the issue of quantum, the trial judge made the following awards:
(1) In favor of Douglas Fowler for his individual injuries in the amount of $15,000.00 plus medical expenses in the amount of $4,016.75;
(2) In favor of Douglas Fowler for medical expenses incurred on behalf of his deceased wife in the amount of $67,565.58;
(3) In favor of Douglas Fowler for the loss of love and affection of his deceased wife in the amount of $90,000.00;
(4) In favor of Douglas Fowler, Douglas Fowler, Jr. and Jerry Fowler for physical injuries and conscious pain and suffering sustained by Mrs. Abbie Fowler in the amount of $500,000.00;
(5) In favor of Douglas Fowler, Jr. for the wrongful death of his mother in the amount of $25,000.00;
(6) In favor of Jerry Fowler for the wrongful death of his mother in the amount of $25,000.00; and,
(7) In favor of Fred Schlesinger for his individual injuries in the amount of $15,000.00[1] plus medical expenses in the amount of $2,588.91.
The judgment recognized Houston General's subrogation rights to the extent prayed for in its petition of intervention. Western Union was cast for all costs.
Appellant does not contest the general damage award of $15,000.00 in favor of Douglas Fowler. Accordingly, we will not disturb this portion of the trial court's judgment as our review of the record discloses no abuse of discretion in the quantum of this award. We likewise find no error in the trial court's award of medical expenses in accordance with the stipulation contained in the record.
However, appellant does assign error to the remaining awards, contending that the trial judge abused his judicial discretion in awarding damages which are excessive and punitive. Plaintiffs have not appealed nor answered the appeal.

CONSCIOUS PAIN AND SUFFERING ENDURED BY MRS. ABBIE FOWLER
Mrs. Fowler was admitted to Opelousas General Hospital on December 4, 1975 for treatment of severe injuries sustained in the accident. She was hospitalized there until her transfer in April, 1976 to Natchitoches Parish Hospital where she remained until her death on July 19, 1976. During the approximately seven and one-half months from the accident until death, Mrs. Fowler was essentially bedridden. Her injuries caused her intense pain and suffering during this period of time for which the trial judge awarded the sum of $500,000.00.
The trial judge summarized Mrs. Fowler's injuries in his written reasons which we quote:
"Dr. Granger (Surgeon):

The Doctor saw her first in the Emergency Room on December 4, 1975. She had severe pain in her left leg. She was a 69 year old, white, female. She was well oriented. She had a fracture of her right forehead.[2]She had a history of diabetes, mellitus, and arteriosclerotic heart disease. She had previously had two heart attacks. Her diabetes was being controlled by diet, but she was not taking insulin shots. She was given insulin in the hospital because of a flare up. She had been under a doctor's care and medication for her heart problem. Her hip fracture was characterized as an `unstable low interchanteric fracture of her right hip and a chip fracture of the right *1308 calcaneal cuboid joint.' The orthopedist recommended an open reduction, after medical evaluation for surgery. She had an open reduction and internal fixation on 12/5/75 by Dr. Lazaro, an orthopedist. The doctor returned on the Monday following and `she was in a dull sensorial state'. She would emerge and recede from reality. She was hospitalized from 12/4/75 to 4/27/76 at Opelousas. During her hospital stay, she fibrillated. She used an indwelling catheter during hospitalization. Urine cultures showed Pseudomonas, which cleared at discharge, and the bardex was removed. She had trouble with her gastrointestinal system, with both diarrhea and intermittant impactions. She had problems, also, with her diabetes mellitus. She exhibited signs of underlying depression and on occasion became acutely agitated. She also had an adrenal insufficiency secondary to the prolonged stress. She may have had pre-existing or existing Addison's disease. This was treated with steroids. She suffered damage and infection in the area of the reduction site of her hip. On 2/27/76 she was operated on for acute cholecystitis, and had to have a gangrenous gall bladder removed. As a result she had to have a tube in the duct between the liver and the intestine (common bile duct) which remained for 14 days and was then removed. She had blunt chest and blunt abdominal trauma. Her gall bladder problem was acute. She apparently recovered from this surgery. She died about the middle of July, 1976. The doctor characterized her hospital stay as `stormy'. Her discharge from the Opelousas Hospital on 4/27/76 was simply a transfer to another hospital in Natchitoches, her home area. At this time she was stable emough (sic) to be moved, but not stable enough to be discharged from the hospital. By description, she had mild contusions over her entire body. Her concussion had about a three day effect. She took 3 or 4 weeks to recover from the gall bladder operation, in comparison with a normal 10 day period, (sic) that is, to the same state of progress. She was bedridden during her hospital stay. She was constantly on medication for pain during her hospitalization. (Note the Discharge Summaries at the end of Dr. Granger's Deposition)

Dr. McCartney (sic) (Family Medicine):
The Doctor first saw the patient on December 4, 1975 at the Hospital. She was unconscious for a while, and then complained of pain in her right hip. Dr. Granger and Dr. Gaar gave her emergency treatment. Dr. McCartney (sic) evaluated the cardiovascular status. She gave a history of a heart attack in November of 1974, and was taking medication. She was also a mild diabetic and taking medicine. Her right lower extremity was in traction. She had some tachycardia. After her surgery she fibrillated as well as experienced tachycardia,(sic) more of an arhythmia. She had wound complications,(sic) it became infected. She had a second closure in surgery. She developed urinary tract infection. She had some diabetic reaction. She exhibited emotional instability, and at times was extremely withdrawn. At times she was agitated. She was given drugs for this. She had endocrine changes (Borderline reserve adrenal function. Whether this was pre-existing is problematic). Her mental state was one reason for eventual transfer to Natchitoches. She also had an acute gall bladder attack, which required surgery. The Doctor relates everything to the accident. She had a low threshold of pain. The Doctor did not see her after discharge.
Dr. Lazaro (Orthopedist)

Saw her first in the hospital. The Doctor saw her with Dr. Gaar. They were consulted by Dr. Granger. She had a fractured hip. The x-rays demonstrated an unstable intertrochanteric fracture of the right hip, and also a chip fracture of the calcaneo-cuboid articulation, which is a small joint in the right foot. Surgery was performed on 12/5/75. She became disoriented and confused. She developed infection. The Doctor kept the wound open with packing so it would heal from *1309 the inside. She had a septic gall bladder which required surgery. During the gall bladder operation, the Doctor closed the hip wound, but the infection came back, and he had to go back to packing. When she left the hospital to go to Natchitoches on 4/23/76, the wound had not healed. He thinks the diabetes contributed to this. She never became ambulatory. She was in constant pain. The Doctor characterized the pain as severe. The death of the patient was trauma connected. The Doctor did not see her after she left the hospital in Opelousas.

Dr. Thomas (General Practitioner)
Saw the patient when she was admitted to the Natchitoches Parish Hospital on 4/27/76. Her condition was very poor. She was comatose, and diabetic. She was completely bedridden, and was suffering effects of an adrenal gland depression. There was still a vacuum or opening in her hip. She was heavily sedated with psychotrophic drugs. He consulted a psychiatrist with reference to removal of the psychotrophic drugs, and they were stopped. Cortisones were stopped. Following this, about June 24, 1976, she became conscious, lucid and communicative for about a week. Her hip was still unhealed. She then suffered a stroke on July 19, 1976. After that she lapsed into a coma and died on July 20, 1976. The hip never healed. On July 16, 1976, she had a fainting spell and vomited blood. He summarizes as follows:
`A. In my opinion, I feel that this lady, who was chronically ill to begin with, she had diabetes and she had arteriosclerotic heart disease, she suffered severe trauma in an automobile accident, in which she suffered a fracture of the right hip. She was subjected to surgery for the repair of this. Shortly thereafter she suffered an attack of acute gall bladder. And then as a result of the stress due to the trauma, developed adrenal gland depression or suppression or shut down, which further worsened her condition and necessitated the use of large doses of Cortisone to maintain her. During the course of which her diabetes was in and out of control. She developed a duodenal ulcer, or stomach ulcer, which is presumed, because of the upper GI bleeding, the gastrointestinal tract bleeding. She also, as a result of the trauma and the stress, suffered a kidney shutdown, which caused her to develop uremia. She also developed a thrombophlebitis, which is inflammation of the veins in her leg, with possible clot formation there. She had an accentuation of the normal degenerative processes that go on in an elderly person. She suffered severe mental depression. She just had more than anybody could possibly bear and live that long. And then she ultimately had a stroke and died. I think that's about the sum total of her situation.'"
Appellant strenuously argues that the award of $500,000.00 to the husband and children of Mrs. Fowler for seven and one-half months pain and suffering is completely unreasonable and punitive in nature. Plaintiffs ask that the award be affirmed in its entirety, pointing to defendant's ability to pay, Barrett v. State Farm Mutual Automobile Insurance Company, 236 So.2d 900 (La.App. 3rd Cir. 1970), and to the magnitude of suffering presented in this case.
While a defendant's ability to respond in damages may properly be considered in making an award, it is well settled that damage awards in tort actions are compensatory in nature and must be reasonable. Punitive damages are not allowed in this State in the absence of specific statutory provision. Universal C. I. T. Credit Corporation v. Jones, 47 So.2d 359 (La.App. 2nd Cir. 1950); Post v. Rodrigue, 205 So.2d 67 (La.App. 4th Cir. 1967).
In considering the propriety of the awards in this case, we are guided by certain legal principles governing appellate review of damage awards. It is well settled that before an appellate court may disturb an award made by a trial court, an abuse of discretion by the trier of fact must be clearly revealed by the record. Even upon a showing of a clear abuse of discretion, an appellate court is not at liberty to render *1310 what it would consider to be an appropriate award under the circumstances, but instead must either raise or lower the award to the lowest or highest point which the trier of fact could reasonably have awarded. Coco v. Winston Industries, 341 So.2d 332 (La. 1976); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977) and cases therein cited.
Louisiana intermediate appellate courts, in the exercise of their judicial functions, are constitutionally mandated to review general damage awards. LSA-Const. Art. 5 § 10(B); Temple v. Liberty Ins. Co., 330 So.2d 891 (La.1976). Our review of such awards, however, is severely limited by the Coco-Schexnayder line of cases which has, in effect, clothed trial court quantum awards with a "presumption of correctness" which is rebuttable only by a clear showing of an abuse of discretion. Thus, appellate courts are often faced with the perplexing problem of according appellant his constitutional right to a just and adequate review of a quantum award, while at the same time remaining within the jurisprudential guidelines set forth above. With all due respect to the Supreme Court, we have some doubt as to whether or not this practice allows an appellant the full and adequate review to which he is entitled under our Constitution.
As we proceed to determine whether or not a clear abuse of discretion is evidenced by the record in the instant case, we fully realize the difficulty of the task facing both trial and appellate courts in attempting to value human pain and suffering in terms of dollars and cents. Pain and suffering, by its very nature, is not susceptible of any precise monetary valuation. Far too often, no amount of money could possibly compensate a victim for the agony which he has endured. Even so, it is the solemn duty of courts to attempt to do the impossible; to somehow arrive at a monetary sum that will hopefully indemnify the victim for his shattered life, and yet not be so harsh as to constitute a punitive award.
Able counsel for appellant, in his brief before this court, refers us to numerous cases in which sums considerably less than that allowed by the trial court in the instant case were awarded. While other reported decisions provide no concrete standard for the assessment of damages, similar cases may serve as aids for determining if an abuse of discretion is presented. Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
However, we draw only meager assistance from these cases. Much can be said for the proposition that no two cases are exactly alike. Indeed, the Supreme Court, in Coco, supra, cautioned us against placing too much reliance on these decisions. Words on a printed page cannot reflect the varying pain thresholds presented in different persons. Injury which causes excruciating pain to one individual may have a milder effect on another person who has a higher tolerance of pain. These and other variables, such as the length of the period of suffering, age and general physical condition of the victim and the degree of consciousness only further compound the difficulty of any attempt of reconciling these cases.
The phrase "abuse of discretion" is at best an elusive term that is subject to varying interpretations. We note that in Coco, supra, the Supreme Court stated that a determination as to whether or not an abuse of discretion exists is a "judgment call". Considering the evidence in the record, we must conclude that the award of one-half million dollars for seven and one-half months of pain and suffering is so excessive as to constitute a clear abuse of discretion. We are not indifferent to the acute pain and suffering endured by Mrs. Fowler. Most assuredly, no one could be found who would willingly undergo such an ordeal even for the payment of that amount of money. However, fairness to the defendant necessarily requires that damage awards have reasonable limits. This award exceeds those limits.
Having found an abuse of discretion on the part of the trier of fact, we must now determine the highest amount which could have reasonably been awarded by the trial *1311 court after interpreting the evidence from the point of view most favorable to plaintiffs. Schexnayder v. Carpenter, supra. Our examination of the record reveals that the evidence supports an award in the $100,000.00 to $200,000.00 range. Accordingly, we will reduce the award for Mrs. Fowler's pain and suffering to $200,000.00 which sum we consider to be the highest amount which the trial judge could reasonably have awarded.[3]

WRONGFUL DEATH OF MRS. FOWLER
The trial court awarded Mr. Fowler the sum of $90,000.00 for the loss of love and affection of his deceased wife. The two adult sons of Mrs. Fowler, Jerry Fowler and Douglas Fowler, Jr., were each awarded the sum of $25,000.00 for the loss of their mother. Appellant contends that these awards are excessive and should be reduced.
Turning first to the $90,000.00 award to Mr. Fowler, the record reveals that at the time of her death, Abbie and Douglas Fowler had been husband and wife for forty-one years. After retiring from a teaching position in the public school system, Mrs. Fowler had become her husband's constant companion, often accompanying him to various meetings and conventions. She was always very active in her husband's election campaigns. They enjoyed a very close relationship with the two children born of their marriage, often taking trips to visit them. They were a happy couple, both content to spend the rest of their natural lives with each other. The loss of his wife caused Mr. Fowler, an active person prior to the accident, to become withdrawn and depressed.
Considering the close bonds existing between this couple, we are unable to find an abuse of discretion in this award. Our conclusion is supported by Aymond v. Department of Highways, 333 So.2d 383 (La.App. 3rd Cir. 1976, writ refused), in which this Court affirmed an award of $80,000.00 in favor of a widow for the loss of love, affection, mental pain and suffering for her 37 year old husband. In Cacibauda v. Gaiennie, 305 So.2d 572 (La.App. 4th Cir. 1974), the Fourth Circuit affirmed an award of $95,000.00 for the wrongful death of a husband.
The trial judge, in written reasons, remarked: "The Husband, being 70 at trial, does not have the resiliency of youth to accommodate to the loss of his wife. Nor, does he have the youth and time left to search for, find and accommodate to a second wife, and, in so doing to minimize his loss . . . Not only the evidence adduced, but the demeanor and the tears of the Plaintiff husband on the witness stand bear witness to the great loss of the Husband".
Considering the evidence in the record interpreted in the light most favorable to plaintiff, we cannot say that an award of $90,000.00 to Mr. Fowler for the loss of love and affection of his deceased wife is excessive.
Appellant argues that the award of $25,000.00 to each of the adult children of Mrs. Fowler is excessive by at least $5,000.00. A reduction of each award to $20,000.00 is suggested. Rodriguez v. Trebitz et al., 304 So.2d 396 (La.App. 1st Cir. 1974). Considering the close personal relationship which existed between Mrs. Fowler and her two sons, we find no manifest error in the trial court's award of $25,000.00 to each of them.

FRED SCHLESINGER
Following the accident, Fred Schlesinger was admitted to Opelousas General Hospital for treatment of his injuries. He was discharged about a week later. We quote from the trial judge's summary of Mr. Schlesinger's injuries:
"Dr. Granger (Surgeon):

The Doctor saw him 12/4/75 at 12:45 P.M. He was a 41 year old, white, male. Dazed at the accident, but oriented as to time, place and person, and in mild distress when seen. He had a deep laceration *1312 of the forehead which extended to the cranium. He also had chest pains, and thought the steering wheel had hit his chest. The Doctor called in Dr. McCartney (sic) for cardiopulmonary evaluation. The two doctors felt he had a pulmonary contusion and a `probable' cardiac contusion. He stayed in the hospital from 12/4/75 to 12/10/75. The Doctors' final diagnosis was: (a) contusion of the chest (b) fracture of the left sixth and seventh ribs (c) a laceration of the forehead which was sutured (d) a concussion (e) multiple soft tissue injuries. The Doctor last saw the patient on 4/5/76. He saw him as an outpatient on 1/13/76 and 1/22/76, and, as stated, on 4/5/76. It takes about 6 to 8 weeks for ribs to heal (x-rays taken on 4/5/76 confirms this). He was able to resume full work on 4/5/76, and was able to resume part-time work on February 2, 1976. On January 13, 1976, Dr. Granger and Dr. McCartney (sic) checked and found `good heart sounds with no murmurs or click on evaluation.' The concussion sustained was mild, but he had some lapse for about 4 days. The Doctor felt the patient definitely had a cardiac contusion, but no irregularities, no heart murmurs, and complete recovery. There was no residual from the rib injury. He came close to pneumonia, so he was given positive pressure breathing.

Dr. McCarthy (a Specialist in the field of Family Medicine):
The Doctor first saw Mr. Schlesinger in the emergency room at 7:00 P.M. on December 4, 1975. The history elicited was that Mr. Schlesinger was rendered unconscious for a period of time. Upon returning to consciousness, he had pain in the face and chest. The Doctor saw an abrasion and dressing on his forehead. Contusions were noted on the chest. He had deep breathing pains. He had fractures of the sixth and seventh ribs. He had a abrasion on the sternum. He was observed for possible cardiac or pulmonary contusion. Dr. Granger took care of a deep laceration of the forehead. He had a concussion (mild). The Doctor saw him in his office 12/18/75. He felt the tests did not show myocardial or pulmonary contusion. He did develop atelectasis and took antibiotics. It took several weeks for him to be pain free. He was hospitalized from 12/4/75 to 12/11/75. He had some discomfort and limitations of activity at discharge. The Doctor referred the patient back to Dr. Granger. The Doctor felt disability to be about 6 to 8 weeks.
Dr. Azar (EENT)
The Doctor made his examination 12/5/75. The patient had difficulty breathing through his nose. He had two black eyes. He had been hit on the dorsum of the nose. There was no evidence of nasal fracture. The Doctor felt all of this was transitory and should clear up in several weeks. The Doctor saw him several times at the office and discharged him September 28, 1976. His nose was swollen and stopped up (partially). It finally got all right. The Doctor described the injury as causing more discomfort rather than pain. The Doctor sent the patient to Doctor Bergeron for allergy tests in the Spring of 1976. The congestion was lasting too long, and that is why the Doctor sent him to Dr. Bergeron."
Mr. Schlesinger was confined at home after his discharge from the hospital, and performed only light duties when he first returned to work around January 26, 1976. He still complains of pain in his left ankle and states that he can't get around like he used to.
A total of 256 hours of sick leave, having a monetary value of $1,711.76, were charged against Mr. Schlesinger during the period from December 6, 1975 through January 26, 1976. This sick leave, had it not been utilized, would have been left to accumulate until Mr. Schlesinger's retirement, where it would have increased his retirement pay.
The trial judge awarded Mr. Schlesinger the sum of $15,000.00 as general damages, apparently intending this amount to also include reimbursement of the value of the sick leave charged against him.
*1313 Appellant contends that the award of $15,000.00 as general damages is excessive and should be reduced to $6,000.00 and further that no award should be allowed for Mr. Schlesinger's sick leave, as such an award would be too speculative.
Although we consider the general damage award to Mr. Schlesinger high we cannot conclude that it does in fact exceed the highest amount which could have been awarded under a reasonable evaluation of the evidence. Accordingly, the award is not manifestly erroneous and will not be disturbed.
We find no merit in appellant's contention that recovery of Mr. Schlesinger's loss of sick leave should be disallowed because of its speculative nature. Appellant argues that this loss will not be sustained until Mr. Schlesinger becomes eligible to retire at some future time. If he does not live to retirement age, he will sustain no loss. Thus, recovery for this alleged item of damages should not be allowed as there is no proof that this loss will become a reality in the future. In answering appellant's contention, we need only state that an award for this item of damages is no more speculative than awards for future loss of wages, future pain and suffering, and future medical expenses, all of which are recoverable under our law. We find sufficient proof in the record that Mr. Schlesinger will sustain this loss upon retirement. Accordingly, we will allow recovery for his loss of sick leave.
For the above and foregoing reasons, the award of $500,000.00 in favor of Douglas Fowler, Douglas Fowler Jr., and Jerry Fowler for the physical injuries and conscious pain and suffering sustained by Mrs. Fowler is amended and reduced to the sum of $200,000.00. In all other respects, the judgment of the trial court is affirmed at the cost of appellant.
AMENDED AND AFFIRMED.
WATSON, J., concurs and assigns written reasons.
WATSON, Judge, concurring:
While I am extremely reluctant to alter the quantum award entered by the trier of fact, I agree that the half million dollar award is clearly an abuse of discretion. Therefore, I agree to the reduction to $200,000.
I note, however, my disagreement with the comments of the majority opinion critical of Coco and Schexnayder. I find no conflict between the jurisprudence and the constitutional duties of the intermediate appellate courts. The appellant is entitled to a review and not a re-trial under the "proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Company, 283 So.2d 716 at 724 (La., 1973).
I respectfully concur in the result.
NOTES
[1] This award was apparently intended by the trial judge to include reimbursement to Mr. Schlesinger of the sum of $1,711.76 which amount represents the value of 256 hours of sick leave that were charged to him from December 6, 1975 through January 26, 1976.
[2] This appears to be an error by the trial court. The record reveals that Mrs. Fowler suffered a hematoma of her right forehead and a fracture of her right hip.
[3] Compare Carollo v. Wilson, 353 So.2d 249, of the docket of the Supreme Court of Louisiana.