387 So.2d 54 (1980)
Carmen BALONEY
v.
Dr. Warren K. CARTER et al.
No. 11174.
Court of Appeal of Louisiana, Fourth Circuit.
July 30, 1980.
*55 Daniel E. Becnel, Reserve, for plaintiff-appellant.
Adams & Reese, Edward J. Rice, Jr., New Orleans, for defendants-appellees.
Henderson, Hanemann & Morris, Robert L. Morris, Houma, for defendant-appellee.
Before GULOTTA, GARRISON and CHEHARDY, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court, dismissing plaintiff's suit against East Jefferson General Hospital, Doctors Warren K. Carter and Ronald Hardey, who have an exclusive contract to provide medical services to the emergency room at East Jefferson Hospital, and Hartford Fire Insurance Co.,[1] the insurer of Carter and Hardey.
Carmen Baloney was injured in a head-on collision on I-10 on September 29, 1974, when a vehicle driven by Michael Frilot was traveling in the wrong direction on I-10. Carmen Baloney was a guest passenger in the vehicle driven by Herman Clayton, Jr. Officers from Troop B of the State Police Force ordered a rescue unit and Carmen Baloney and Herman Clayton were taken to the East Jefferson Emergency Room for treatment. Michael Frilot was pronounced dead on arrival.
The Emergency Room record states:
"History:
Patient brought in by Kenner Fire Unit from I-10 and Loyola. Auto accident. Police at the scene. Patient complains of pain in both legslaceration right elbow.
Diagnosis:
Laceration and contusions left knee.
Full Range of Motion:
All jointsx-ray, no fracture.

Blood Pressure: 138/90
Pulse: 108
Respiration: 28

Treatment:
X-ray Left Knee.
* * * * * *
"Recommendation and/or instructions to patient: See Guevara (lined out and added) "Meharry Hospital" in one week.
/signed/ R.A. Hardey, M.D. 9/24/74"
On October 2, plaintiff was admitted to Oschner Hospital at the request of Dr. F. J. Padua, an orthopedist whom she had consulted in the interim. At Oschner, she underwent treatment for a fractured pelvis and a fractured right leg. She was treated at Oschner, where she was placed in traction, for a period of approximately three weeks.
Carmen Baloney filed the instant suit in tort alleging negligence on the part of the defendants in failing to properly diagnose the injuries, failing to properly x-ray Carmen Baloney, failing to refer plaintiff to a specialist, failing to hospitalize the plaintiff after she had so requested and failing to properly equip and/or supervise the operation of the emergency room.
After trial on the merits, the district court rendered judgment reading in part as follows:
". . . the Court being of the opinion that while defendants were negligent in the premises,[2] that said negligence was in *56 no way responsible for any damage to Plaintiff, and that said case is a classi example of `injuria absque damnun'"[3]
From the judgment of dismissal, which we reverse, Carmen Baloney appealed.
At trial, Carmen Baloney testified as follows:
"Q: And, when you got to the emergency room, did you make any complaint?
A: Yes, I did. My kneewell, my knee was cut. I complained about that and my hip, that my right hip was hurting. It was hurting. It was very painful and I couldn't stand on it at all, not alone. I needed help. Somebody had to be on both sides of me to hold me up. I couldn't put pressure on it at all.
Q: Did you ask for the hip to be X-rayed?
A: Yes, I did.
Q: Did you ask for any other x-rays to be taken?
A: No. My concern was the hip. That's where I was paining. But, the only x-rays that was taken was the one of the knee that was cut. So, they had to take x-rays to see if they had any debris, any debris in my knee.
Q: Now, did you see Dr. Hardey, at the emergency room?
A: Yes, I did.
Q: What did he tell you and what did he do for you?
A: He sutured my knee and I hadthe arm wasn't bad enough to have stiches, so, they just bandaged it up. And, I complained about my hip. So, he said he checked it and say it most probably was a sprain. So, I asked him could he give me some kind of pain pill to help it because it was hurting real bad. So, he said well, I'll give you a prescription for some pain pills. So, he gave me the pain pills and told me that the only thing I had to do was like rub my leg down real good with either some alcohol or something to help the sprain.
Q: Now, did you, Carmen, at that time, tell the physician that you had been unconscious after the accident?
A: Yes. He asked what happened. I told him that I hadthat I was sleeping and that I was knocked unconscious.
Q: Did you tell that to the nurse also when she asked you and took a history?
A: Yes.
Q: Were you next to Mr. Clayton, being treated in the emergency room?
A: Yes. The only thing they had separating us was the curtains. (Tr. pp. 99-101).
* * * * * *
"Q: Now, after you were released from the hospital, were you able to walk down to the car?
A: No. I couldn't get off the table alone. It was painful. Like the nurse told me, she said, you can walk now. You just put pressure on this other leg that has the suture, you walklike they have the little stool you usually step on to get on, I tried, but I couldn't, and I told her. So, my brother put me in the wheelchair and he brought me down and he had to carry me to the car and out of the car after we got home.
* * * * * *
"Q: Now, after you went home, did you have any further problems with your hip?
A: It got worse. I was beginning to stiffen up. Like, it was after I got home from the hospital, by the time it took us to get home I was stretched out on the back seat, and I was beginning to stiffen up. Then, when we got home my brother carried me and put me in the bed and I was all stiff and everything then. And it was hurting and as the days passed on it got worse.
Q: Were you in bed the entire time, from the period before you saw a physician?
A: Yes, I was." (Tr. pp. 101-102)

* * * * * *
*57 "Q: When you got to the Oschner Foundation Hospital, did you tell the physician that admitted you what had happened and what was hurting?
A: Yes, I did.
Q: Did you tell the admit clerk that you were asleep when the crash took place and that you were awakened and alert when you reached the hospital? Did you tell them that?
A: Yes, I did.
Q: Did you also tell them that you had pain in your hip and that you were treated at the East Jefferson Hospital for your elbow, your left knee and you were x-rayed?
A: Yes.
Q: And, that's what you had told the admit clerk when you arrived there, four days after the accident occurred, at Oschner?
A: Yes.
Q: Did you ever tell any other physicians at Oschner that the pain in your hip didn't start until two or three days after the accident?
A: No, because it started that same night of the accident, right after the accident. At least I became alertthat's when I started feeling the pain." (Tr. pp. 106-107)
* * * * * *
"Q: Did you ask Dr. Hardey to have you hip x-rayed?
A: Yes, I did.
Q: Why did you ask him that?
A: Because it was hurting and I figured something was wrong with it because of the way it was hurting.
Q: Did you ask him to have your hip x-rayed before or after your knee was x-rayed?
A: I don't know whether it was before or after but I know I asked him.
Q: You don't remember when?
A: No.
Q: When you asked the doctor that your hip be x-rayed, according to your testimony, was that before your family arrived?
A: Yes, it was before they arrived.
Q: Did you ask Dr. Hardey that the x-rays be taken of your head?
A: I didn't ask him anything about my head, no." (Tr. p. 116)
* * * * * *
"Q: I believed you testified, Ms. Baloney, that Dr. Hardey told you that you had a sprain?
A: Yes.
Q: And, he used that term?
A: Yes.
Q: You had a sprain?
A: Yes.
Q: And, that was with reference to pain in your hip?
A: Right.
Q: Did he specifically examine you hip area?
A: Just kind of felt it and just said well I think it's just a sprain.
Q: But, he didn't try to move your hip or anything like that or bend it?
A: No.
Q: Is that right?
A: No, he didn't. (Tr. p. 121)
* * * * * *
"Q: So, that it's your testimony that he did not either flex, move up and down, or turn, rotate your hip?
A: No.
Q: Didn't check for hip movement at all, is that right?
A: No.
Q: Did he check for movement of any other part of your body?
A: No.
Q: Did he check your knee?
A: The knee was cut. He checked it to see if anything was in it and kind of felt around it and got ready to stitch it up.
Q: And, what about your ankle?
A: No.
Q: What about your arms? Did he check your arms?
*58 A: He checked where I had the little cut. That was it.
Q: Did he move your arm around at all?
A: No.
Q: Did he check your abdomen or your stomach?
A: No.
Q: Did he examine you abdomen or your stomach at all, even through your clothing.
A: No.
Q: So, basically, the only thing he did do on the initial examination, was look at your two cuts, one on your knee?
A: And one on my elbow
Q: And, that's all he did, is that right?
A: That's all. My leg, my right leg, he just felt it up on my thigh part. He just felt it and says, most probably a sprain.
Q: Did he feel it just on one side or did he feel on both sides?
A: Right in the center part.
Q: Just on your right leg?
A: Just the right leg.
Q: Didn't push on your left side and you right side?
A: No.
Q: Didn't try to push your hips together?
A: Not at all.
Q: And, didn't pick up your leg and move it in any way and didn't ask you to do it, is that right?
A: No, he didn't. (Tr. pp. 122-123)
* * * * * *
"Q: And, you also asked Dr. Hardey, at that time, since you were going to have an x-ray of your knee, if they would also x-ray your right hip, is that right?
A: Yes.
Q: And, what did he say?
A: I don't recall what he said. He just ordered to do an x-ray of the knee. That was it. I asked him because the leg was hurting, you know, it was hurting real bad, and that undoubtedly something was wrong with it. I know they usually can tell if something is wrong if they take an x-ray. They can usually tell something broken.
Q: Did he tell you he was not going to have an x-ray?
A: He didn't do it. He just didn't do it. He took an x-ray of the knee and told me it was sprained.
Q: When you came back after having your knee x-rayed, did you ask again why your hip wasn't x-rayed?
A: No, I did not ask him. He told me it was sprained. So, I believed him that it was sprained." (Tr., pp. 123-124)
Carmen Baloney's testimony that she complained of hip pain and that she asked to have her hips x-rayed is corroborated by several other people. Herman Clayton, Jr., the other injured party who survived the accident, testified that he heard the plaintiff complain of hip pain:
"Q: Were you placed in a room next to Ms. Baloney?
A: I was placed in the same room with her but there was a curtain between the two of us.
Q: Did you overhear anything in connection with her treatment?
A: Her complaining about the pain in different areas, the legs, the hips.
Q: What was she complaining about?
A: Pain in the legs, hips, armsat the time she was talking to whoever it was in the room with her and they were asking the different areas that it hurt and how she was feeling or just what she was saying her legs, her hip, her elbowa list of what was actually paining her, and she was constantly saying because they kept asking about it . . ." (Tr. p. 44).
* * * * * *
"Q: And, you specifically remember her stating that she had pain in her hips, is that correct?
A: Legs and elbow, yes.
Q: Hips?
A: Yes, yes.
Q: You specifically remember the word hips, is that right?
A: Yes.

*59 Q: Do you recall whether or not she or anyone else made any mention that she was unable to move her legs or her hips?
A: We had to carry her from the car. She couldn't walk . . . (Tr. p. 53)
* * * * * *
"Q: You indicated that Ms. Baloney complained specifically of pain in the hip. Were you in a position to see whether or not Dr. Hardey was there at the time she made those complaints?
A: I do not remember Dr. Hardey, so, I couldn't say whether the man was around or not. I was next door to Ms. Baloney and all I heard was her telling someone. It could have been even Dr. Hardey. It was about the pain in different areas that were already mentioned.
Q: But you don't know for a fact that Dr. Hardey was there at the time that she mentioned any problem with her hip, is that correct?
A: No, I don't know who was in the room with her." (Tr. pp. 55-56)
Herman Clayton further corroborated the allegation by Earl Baloney, Sr., Carmen's father, that he had requested that Carmen be admitted to the hospital.
"Q: Were you present when a request was made by anyone from Ms. Baloney's family, to keep her in the hospital?
A: I did hear her father, outside the x-ray room, ask someone. I was on by backI don't know who it was, but, ask someone to admit her to the hospital or if they would admit her to the hospital.
Q: And, you don't know what occurred after that?
A: No, I don't. I was rolled into the x-ray room.
* * * * * *
"Q: Did you ever hear anyone ask or tell Dr. Hardey that Ms. Baloney should be admitted to the hospital?
A: Again, I couldn't tell whether it was Dr. Hardey, because I didn't recall seeing the man himself. Again, I do remember Mr. Baloney asking someone to admit his daughter to the hospital. Other than that, I don't know if he asked Mr. Hardey or if anyone did." (Tr. pp. 46-47).
Earl Baloney, Sr., the plaintiff's father, testified that he was summoned to the emergency room by the hospital staff. When he arrived at the emergency room, Carmen complained to him about pain in her hip:
"Q: Did she make any complaint to you, about her legs, her hips, her elbow, her knee?
THE WITNESS: The main problem was her hip. She was showing me the cuts, the lacerations where she had sutures but her main complaint, statement, was her hip was hurting her and the one they failed to x-ray. She didn't x-ray her hip and she asked them to x-ray it, they never did." (Tr. p. 81)
* * * * * *
Q: You asked her?
A: Yes. She kept telling her what was hurting her and they never x-rayedher main complaint was not the laceration on the elbow, her main complaint was her hip, and that's what she told me about. They didn't x-ray it. She told me." (Tr. p. 90)
Additionally, Earl Baloney sought to have his daughter hospitalized, but was refused:
"Q: What did you ask the nurse?
A: I asked her to, don't she think she should be admitted to the hospital and she said that the doctor don't think it's necessary. She only is going to be stiff for a few days and I told her I am very much concerned that my daughter or anyone else, child, involved in a head-on collision, will be concerned and after knowing that she was practically knocked unconscious for four or five minutes, that is serious enough right there to be admitted, regardless of the hip, and she stated she would only be stiff. I wasn't so much concerned about her being stiff, but, her being knocked out in the accident, and had a head injury.
Q: And you were told that it was not necessary for her to be admitted?
A: The nurse told meshe said the doctor said it's not necessary, she will only be stiff three or four days.

*60 Q: Then, what did you do with your daughter?
A: I carried her from the wheelchair to the car and we carried her back home and placed her in the bed. (Tr. pp. 81-82)
* * * * * *
"Q: Carmen was conscious?
A: Right.
Q: You spoke to her?
A: I did.
Q: Who was with her at the time you spoke to her?
A: The nurse was right there.
Q: Was the doctor?
A: I didn't see no doctor.
Q: Did you see, at this time, if Carmen had already had her left knee stitched up?
A: Right. She had had her clothes on. Undoubtedly, she is sutured, being undressed from the accident or the x-rays or what happened, but, she was ready to go home when we got there.
Q: She was ready to go home?
A: She was sutured and she was sitting in a wheelchair.
Q: You heard Carl testify that he asked you to speak to the nurse about admitting her to the hospital.
A: I did.
Q: Is that correct?
A: Right. I say it because I was very concerned. I wanted her admitted not too much about the knee or hip, but being knocked out for four or five minutes, is a serious condition, in my estimation. Head injuries arethey are the most important since in an accident, if the head injury is involved as she said she wasI wasn't at the scene, but, there was a statement she was knocked out.
Q: So, you are concerned at this time about wanting her to be admitted?
A: For evaluation.
* * * * * *
"Q: And, what was the nurse's reply to you?
A: The doctor said she was going to be stiff for a few days and not necessary to be admitted to the hospital, just rub her down with alcohol. So, I was very relieved about that, thinking it would be that's all it would be, and, we find out it turns out just the opposite." (Tr. pp. 87-88)
Carl Baloney, the son of Earl Baloney and the brother of the plaintiff, accompanied his father to the emergency room. Carl Baloney also testified that his sister complained of hip pain while she was at the emergency room:
"Q: Was she making any complaint at that time, sir?
A: She was complaining that she had complaints about her hip and knee.
Q: Why couldn't she walk?
A: Well, my question was in making preparations to leave, you know, did she really need the wheelchair or was she just placed in it for convenience. She statedshe complained about her hip and but, I asked her to walk because she could put pressure on her right but she didn't have any stitches on the other, so, she could hop to any car. But, she said she couldn't put pressure on the right leg because she was in pain. (Tr. p. 64)
* * * * * *
"Q: And, you are positive your sister was complaining that day, that night, in the hospital or that early morning in the hospital of pain to her hips, her legs, knees, and elbows?
A: I'm definite because I had to carry her from the wheelchair to the car, from the car to the bed, you know. She was not able to put any pressure at all on her leg." (Tr. p. 66)
Carl Baloney also testified that his father had sought to have Carmen admitted, but was refused:
"Q: Did you and your father ask that she be admitted to the hospital?
A: Well, I questioned him. I said, let's see about getting her admitted, examined further. My father, I think, spoke with one of the nurses to see about having her admitted and what the nurse told him when he came back is that it was not serious, that she would probably be stiff *61 for a couple of days because of probably a sprain in her leg. (Tr. p. 64-65)
* * * * * *
"Q: Did you specifically request that your sister be admitted to the hospital?
A: I was concerned, I asked my father I'm a pre-med student. So, I have some basic knowledge as far as her injury. I was concerned of her being, my sister, and concerned because of just knowledge of the accident. I thought it was severe because I had seen the condition of Clayton and I knew first-hand that there was a fatality. And, I felt that she should have been examined further.
Q: Did you ask this of the nurses?
A: I requested my father to talk to them to see if she could be admitted.
Q: Did your father then in turn request this of the nurses?
A: He did.
Q: Was anything done?
A: No. He was reassured that her injuries were not serious enough to warrant any admission. (Tr. pp. 65-66)
* * * * * *
Q: Now, this nurse, was this a female nurse?
A: Yes.
Q: And, what was her reply to your father?
A: That she had been examined and they have taken x-rays, because he asked for the x-rays. I had questioned Carmen myself, as to had they taken x-rays of the hip, which she had not taken. The nurse advised my father that x-rays had been taken and she had been checked by the doctor and that she would probably be stiff for a couple of days and that the hipand, that the leg would probably, the leg was probably sprained." (Tr. pp. 69-70)
In contrast to the testimony of the previous witnesses, Dr. Hardey testified that the plaintiff made no complaints of hip pain to him, although she did complain of pain in both legs:
"Q: . . . Would you explain for us, what the entry, under the brief history section, particularly, patient complained of pain in both legs, would indicate to you as a physician?
A: Pain in the legs, anatomically, the leg is the portion of the lower extremity, between the knee and the ankle. Now, the portion between the knee and hip is referred to as the thigh, but, lay people generally don't make the distinction. So, that the leg means anything below the hips. (Tr. p. 162)
* * * * * *
"Q: With regard to that entry, what did you do in the particular history in which you took with this patient?
A: When the patient complains of pain in both legs, then I check the mobility of all the joints in both legs, both lower extremities. You flex the ankle, flex the knee, flex the hip, rotate the hip.
Q: Would you explain to the Court how you would accomplish that with the patient on a stretcher such as Ms. Baloney testified that she was at the time of your examination?
A: You would first check for active mobility, ask the patient to move the part. If the patient is unable to move the part, either unable or unwilling, because pain might intervene, then you raise the part yourself. You would have to raiseextend the leg from the tablecheck it at the knees. Next, check it at the ankle and rotate it to check for hip mobility.
Q: What is the effect of flexing the knee of a patient lying on a stretcher?
A: Well, you can't flex the knee without also flexing the hip.
Q: What is the effect of rotating the knee with a patient on a stretcher?
A: Well, a normal knee doesn't rotate. The rotation motion is transferred to the hip. The hip would rotate.
Q: If in fact you would not have been able to flex this, without complaint of pain, would any notation have been made on this chart?
A: I don't follow that.
Q: If you had not been able to flex the knee, and rotation of her joints, particularly *62 the hip joint, would any notation to that effect have been made on this particular chart?
A: If such a manipulation had induced pain in the patient, a pain response in the patient, then you would have suspected injury at the level that the pain occurred, and consequently would x-ray that part.
Q: Was any complaint, of pain, made to you, either by the patient or by any of the hospital personnel, about Ms. Baloney's hip or the pelvic area?
A: No complaint was ever registered concerning the hip." (Tr. pp. 163-164)
Dr. Hardey also testified that no one requested of him that x-rays be taken of the hip area and that no one asked to admit Carmen Baloney to the hospital.
"Q: Ms. Baloney has stated that she asked you to have her hip x-rayed. Do you recall that?
A: No. I do not recall that she asked anything concerning the hip or mentioned the hip in my presence.
* * * * * *
"Q: Did either Ms. Baloney or anyone in her family request or suggest hospitalization for her on that evening?
A: Not at any time." (Tr. p. 168)
Our review of the record indicates to this court, as it did to the trial judge, that the defendants were negligent. However, we find results of the judgment to be erroneous as a matter of law.
The theory of damnun absque injuria is one rarely seen in the jurisprudence of Louisiana. In McFarlain v. Jennings-Heywood Oil Syndicate, 118 La. 537, 43 So. 155, 156 (1907), the Louisiana Supreme Court reasoned that damnum absque injuria could not be asserted as a defense to plaintiff's allegations that his property had been damaged by oil field waste overflow, because the defense was predicated upon the assumption that there existed a servitude of drain on the lower estate owned by plaintiff, whereas Civil Code Art. 660 provided only for a natural servitude of drain, not created by the industry of man.
In Helmer v. Colorado Southern, N.O. & P.R. Co., 122 La. 141, 47 So. 443 (1908), the Louisiana Supreme Court cited, prior to reversing, its own prior ruling in McMahon v. Railroad Co., 41 La.Ann. 827, 6 So. 640, 641 (1889) wherein the court held that:
"(m)ere consequential damage to property, when the property itself was not taken, was not recoverable, and much less any damages resulting to individual owners in the way of discomfort, inconveniences, loss of business, and the like. All such injuries, inasmuch as they resulted only from the exercise by another of his legal right were damna absque injuria." (emphasis added).
In Helmer, the court reversed itself finding:
". . . that noise, smoke, vibrations, etc. incident to the operation of defendant's trains in front of plaintiff's property are elements of damage to be considered, if the market value of plaintiff's property is thereby diminished, the amount of damages to be determined by the difference between the market value before the road was built and the market value afterwards." (47 So. at 444).
In Jarnagin v. La. Hwy. Comm., 5 So.2d 660 (La.App. 2nd, 1942), the Second Circuit, failing to cite Helmer, above, cited the McMahon case above for the proposition that in expropriation cases under Art. I § 2 of the Constitution of 1921 which provided just compensation for property taken "or damaged," the language "or damaged" was not intended to cover damages to property where the damage, if any, "is general to all property in the neighborhood of plaintiff, and not specially sustained by her property; that if any consequential damage has been suffered because of the improvement, such falls within the realm of damnum absque injuria." (emphasis added). At 663.
In Dupont v. Thibodo, 5 So.2d 383 (Orl. La.App., 1942), the court found that plaintiff's loss of business and stock in trade, resulting from draining and sewerage work done in front of his business, which forced him to close, were not recoverable stating:
". . . In any event, the inconvenience and loss which plaintiff suffered *63 was necessarily incident to the execution of defendant's contract with the Sewerage District for the installation of sewerage pipe, a public improvement which could not be effected without inconvenience to adjacent property holders and since we find no negligence on the contractor's part, the damage which plaintiff has suffered is damnum absque injuria." (emphasis added). At 385.
In Evans v. Dugan, 205 La. 398, 17 So.2d 562 (1944), the Supreme Court again relied upon the theory of damnum absque injuria:
"Plaintiff, as a riparian proprietor, has no right to appropriate to his exclusive use the shore of Lake Bistineau lying in front of his land, nor has he any private property right in the use thereof, which is public and under the administration and control of the state agencies designated in the legislative acts. Unless manifestly abused, the discretion of the Lake Bistineau State Game and Fish Commission and Department of Conservation in determining what are suitable and needed facilities to promote the public use and enjoyment of the area embraced within the Preserve is not a proper subject for judicial control or interference. The authority of the Commission and the Department of Conservation in this respect is not restricted by Article 455 of the Civil Code which declares that "the use of the banks of navigable rivers or streams is public," and that "accordingly every one has a right freely to bring his vessels to land there," etc. This general right must yield to the specific right granted the Lake Bistineau State Game and Fish Commission and the Department of Conservation to control and supervise the territory embraced within the Lake Bistineau State Game and Fish Preserve as established by Act No. 43 of 1930 and Act No. 64 of 1942. Whatever incidental damage may result to plaintiff or to other proprietors of lands bordering on the shore of the lake within the Preserve from the exercise by the designated agencies of their right to control and supervise the Preserve is damnum absque injuria. . ." (emphasis added). At 566.
In Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471 (1943), the Louisiana Supreme Court allowed plaintiff to recover damages sustained as a result of subsurface trespass which occurred when the defendant slant drilled into a pool of oil to which plaintiff alone possessed mineral rights. In rejecting a defense of damnum absque injuria, the court specifically cited R.C.C. Art. 21 and stated:
"Furthermore, the Revised Civil Code confers upon judges broad and sweeping equity powers in cases where there is no express law to guide them, and `Equity will not suffer a right to be without a remedy.'" (emphasis added). 16 So.2d at 478.
The court additionally rejected the doctrine on a theory of negligence:
"This is not a case of "damnum absque injuria." That is a phrase used to describe a loss arising from actions or conditions which do not create a ground of legal remedy. (See 11 Words and Phrases, Permanent Edition, Damnum Absque Injuria, page 59.) The acts done by defendantif it did themconstituted a trespass upon the property of plaintiff, a wrong for which the law provides a remedy. Revised Civil Code, Article 2315." 16 So.2d at 478.
The most recent case to mention the theory is Harvey v. Great American Indemnity Co., 110 So.2d 595 (La.App. 2d, 1959). In Harvey, the court applied proximate cause analysis to an automobile accident. In differentiating between "proximate cause" and "remote cause" the court cited Cyclopedia of Automobile Law and Practice, Section 2531 for the following proposition:
"The remote cause is that cause which is behind the proximate cause, which produces the injury, and those damages which are the result of a remote cause form a part of that large mass of resulting losses styled `damnum absque injuria,' for which the law permits no recovery." At 600.
As is indicated by the caselaw discussed above, where a valid, even if conflicting, *64 exercise of a superior legal right gives rise to only consequential damages, or is merely a remote cause as opposed to a proximate cause, then those damages are non-recoverable under damnum absque injuria. But where that exercise of a right creating consequential damages is incurred by specific allegation in tort and the damages are incurred by specific persons as opposed to the public generally, then the theory of damnum absque injuria will not defeat an action in tort.
Although the trial judge did not provide written reasons for judgment, in order for him to have applied damnum absque injuria, he must have erroneously concluded that the four day delay in obtaining treatment, resulting from defendants' failure to diagnose the fracture or heed plaintiff's and plaintiff's family's complaints and request, did not result in an aggravation of the injury incurred in the accident; but this is not the harm for which damages are sought. The harm is the four additional days of pain and inconvenience suffered by Carmen Baloney, who testified that as soon as she was placed in traction, the pain ceased.[4] "Pain, although unaccompanied by objective signs of injury, is compensable because it is `damage' to the person suffering such pain." Nelson v. Hawkins, 244 So.2d 656, 547 (La.App. 2d, 1971).
Pretermiting a discussion of medical malpractice, we note that the trial judge found that the defendants were negligent in the premises. The evidence presented also convinces this court that such negligence indeed occurred and that the trial court's reasons for judgment on this issue should be allowed to stand.
Turning now to the question of quantum, we note the peculiar nature of the damages to be awarded. Although plaintiff's cause of action in the instant appeal is different from the cause of action which gave rise to the various fractures, the majority of the damage suffered by plaintiff was resultant from the automobile accident, which suit was concluded by a prior settlement. As all special damages were incurred as a result of the suit previously settled, this court seeks to award only general damages for the period of Sunday, September 29 through Wednesday, October 2, in hours, roughly three days. Unfortunately, our reported cases are not so neatly broken down. A review of recent awards of general damages for hip, pelvic, and leg fractures, however, reveal the following:
1. Monnerjahn v. Aetna Life & Cas. Co., 350 So.2d 1249 (La.App. 4th, 1977), $25,000.00 general damages;
2. Chmurka v. Southern Farm Bureau Ins. Co., 357 So.2d 1207 (La.App. 4th, 1978), $15,000.00 general damages;
3. Fowler v. Western Union Tel. Co., 357 So.2d 1305 (La.App. 3rd, 1978), writ refused, 359 So.2d 196 (La.), $200,000.00 general damages;
4. Anding v. Southwestern Ins. Co., 358 So.2d 690 (La.App. 3rd, 1978), writ refused, 360 So.2d 1179 (La.), $200,000.00 general damages;
5. Sansonni v. Jefferson Parish School Board, 344 So.2d 42 (La.App. 4th, 1977), writ refused, 346 So.2d 209 (La.), $45,000.00 general damages;
6. Rheams v. McCray, 346 So.2d 834 (La. App. 1st, 1977), writ refused, 351 So.2d 154 (La.), $7,500.00 general damages;
7. Bevil v. Heath Timber Co., 347 So.2d 889 (La.App. 3rd, 1977), $20,000.00 general damages;
8. Teal v. Allstate Ins. Co., 348 So.2d 83 (La.App. 4th, 1977), writ refused, 351 So.2d 164 (La.), $15,000.00 general damages;
9. Witherwax v. Boys Village, Inc., 350 So.2d 196 (La.App. 3rd, 1977), $15,000.00 general damages;
10. Jenkins v. Ferguson, 357 So.2d 39 (La.App. 3rd, 1978), $10,000.00 general damages;
11. Smith v. Castle, 361 So.2d 303 (La. App. 1st, 1978), rev'd 360 So.2d 795 (La.), $10,000.00 general damages.
*65 In light of the applicable range of damages, an award of $12,000.00 would be neither inadequate nor excessive.
For the reasons assigned, the judgment of the district court is reversed and we render judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the Plaintiff, Carmen Baloney, and against the Defendants, Dr. Warren K. Carter, Dr. Ronald Hardey, Hartford Fire Insurance Co., and East Jefferson General Hospital, individually, severally, and in solido, in the sum of SIX THOUSAND and NO/100 ($6,000.00) DOLLARS with legal interest from the date of demand until paid and all costs of the proceedings.
REVERSED AND RENDERED.
GULOTTA, J., concurs.
GULOTTA, Judge, concurring.
I concur with the judgment awarding damages to plaintiff. However, I am of the opinion that the $6,000.00 award is somewhat high. I would render judgment awarding a substantially lower amount.
NOTES
[1] Although the case is captioned "Hartford Accident and Indemnity Co.," the corporate name is Hartford Fire Insurance Co. See Answer filed Nov. 2, 1977, T. Vol. I, p. 49.
[2] "premisesThat which is put before; that which precedes; the foregoing statements . . in pleading, the expression `in consideration of the premises means in consideration of the matters herein stated . . ." Black's Law Dictionary, (West Publishing Co., 4th Ed., 1968) p. 1343.
[3] "injuria absque damnoInjury or wrong without damage. A wrong done, but from which no loss or damage results, and which, therefore, will not sustain an action." Black's Law Dictionary, supra, p. 24.
[4] Tr. p. 108.