742 So.2d 572 (1999)
Joseph GIAMMANCHERE, et al.
v.
John ERNST, III, M.D., Dr. Miljana Mandich, M.D. AND Touro Infirmary.
No. 96-CA-2458.
Court of Appeal of Louisiana, Fourth Circuit.
May 19, 1999.
Opinion Granting Rehearing September 15, 1999.
Writs Denied December 17, 1999.
*573 Daniel W. Nodurft, Gretna, Louisiana, Counsel for Plaintiffs/Appellants.
George E. Cain, Jr., Greg A. Pellegrini, Frilot, Partiridge, Kohnke & Clements, L.C., New Orleans, Louisiana, Counsel for Defendant/Appellant The Louisiana Patients' Compensation Fund.
Peter E. Sperling, Monique G. Morial, Frilot, Partridge, Kohnke & Clement, New Orleans, Louisiana, Counsel for Defendant/Appellee John Ernst, III, M.D.
Court composed of Chief Judge ROBERT J. KLEES, Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES, Judge DENNIS R. BAGNERIS, Sr.
PLOTKIN, Judge.
The Louisiana Patient's Compensation Fund ("LPCF") appeals a jury verdict awarding the plaintiffs, the surviving spouse and children of Ms. Louise Giammanchere (hereinafter referred to collectively as "the Giammancheres"), $800,000 in survival and wrongful death damages, based on the negligence of defendants Touro Infirmary and Dr. Miljana Mandich. The Giammancheres appeal the jury's finding *574 that defendant, Dr. John Ernst III, was not at fault for the injuries sustained by Mrs. Giammanchere that lead to her death. We affirm in part, reverse in part, and amend the damage award.

Facts
On September 9, 1988, Mrs. Giammanchere fell as she was leaving a physical therapy session at Touro Infirmary. She was immediately transported to Touro's emergency room with the help of her physical therapist, Melinda Rome. Dr. Mandich examined Mrs. Giammanchere and reviewed the x-rays taken as a result of the fall. Dr. Mandich concluded that Mrs. Giammanchere suffered sprained muscles in the left hip and released her with an after-care instruction sheet. The record evidence indicates that the hip fracture was discovered by a Touro radiologist later that same day, and that the x-rays were returned to the emergency room. However, Ms. Giammanchere was not informed of the hip fracture on that date.
On September 23, 1988, Mrs. Giammanchere visited her regular physician, Dr. Ernst, complaining of lower back pain. At that time, she told Dr. Ernst about the fall that occurred at Touro. However, Dr. Ernst was not given the records from the emergency room nor was he informed that X-rays had been taken. Mrs. Giammanchere contacted Dr. Ernst again on October 19, 1988, to inform him that her hip was causing her extreme pain. Dr. Ernst ordered Mrs. Giammanchere to go immediately to the emergency room to be examined by Dr. Charles Billings, an orthopedic surgeon.
Dr. Billings ordered additional x-rays and reviewed the original x-rays taken the day Mrs. Giammanchere fell at Touro. Dr. Billings diagnosed a hip fracture, which was evident on both sets of films. Mrs. Giammanchere was admitted to the hospital to undergo a week of physical therapy. She was released on October 26, 1988, with a prescription for home therapy. The home therapy was not effective, and Dr. Billings performed surgery to repair Mrs. Giammanchere's injured hip on December 31, 1988. Mrs. Giammanchere suffered several system failures, including a stroke, following the surgery and died in the hospital on April 14, 1989. She remained in the hospital from the date of surgery until the day she died.
The Giammancheres filed suit against Touro, Dr. Mandich, and Dr. Ernst. Prior to trial, the Giammancheres settled their suit against Dr. Mandich for $31,500. Following the trial, the jury found that Dr. Mandich and Touro fell below the standard of care by failing to inform Mrs. Giammanchere of the fracture and that the misdiagnosis of the hip fracture caused Mrs. Giammanchere's ultimate death. The jury awarded $400,000 in survival damages, $325,000 in wrongful death damages to Mr. Giammanchere, and $25,000 each in wrongful death damages to each of the three Giammanchere children, for a total award of $800,000.
On May 23, 1996, the trial court entered judgment in conformity with the jury verdict against Touro and Dr. Mandich. However, because the defendants were all qualified health care providers under the Louisiana Medical Malpractice Act, the trial court reduced the award to the $500,000 maximum for medical malpractice damages. LSA-R.S. 40:1229.01 et seq. Fault was apportioned as follows:

Dr. Ernest 0%
Touro Infirmary 10%
Dr. Mandich 60%
Ms. Giammanchere 30%

After the judgment, on June 28, 1996, the LPCF, which is responsible by law for any damages in excess of $100,000, intervened in the action, then filed the instant appeal. The Giammancheres also appealed, contesting the jury's finding that Dr. Ernst was free from fault.

Exception of Res Judicata
The LPCF filed an exception of res judicata in this court, citing a October 13, 1997 trial court judgment dismissing a petition filed by the Giammancheres against the *575 LPCF after the entry of judgment in the instant case on exceptions of lis pendens and no cause of action. The LPCF claims that the October 13, 1997 judgment should be considered res judicata to the issues raised by this appeal. The alleged basis of the no cause of action was the Giammancheres' failure to meet the requirements of the Medical Malpractice Act to retain the suit against the LPCF after settlement with Dr. Mandich. We can only assume that the basis of the exception of lis pendens was the appeal of the judgment in the instant case. However, the record before this court contains no evidence of the actions of the trial court following the entry of the judgment on appeal in the instant case. Because the record contains no evidence to support the LPCF's exception of res judicata, the exception is hereby denied.

Medical malpractice
In order to recover damages in a medical malpractice case, the plaintiff must establish the following elements through expert medical testimony: (1) the standard of care applicable to the defendant health-care provider (2) breach of the standard of care by the defendant healthcare provider (3) cause-in-fact between the breach and the damages suffered, and (4) actual damages. LSA-R.S. 40:1299.39; Bailey v. State Through Dept. of Health and Human Resources, 96-2797, p. 4 (La. App. 4 Cir. 5/21/97), 695 So.2d 557, 559. A trial court's decision on these inquiries is considered a factual conclusion, reversible on appeal only if the appellate court finds manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991); Bailey, at 4, 695 So.2d at 559. Accordingly, this court may reverse the trial court's findings that Dr. Mandich and Touro committed medical malpractice only if it makes the following findings: (1) the record reflects no reasonable factual basis for the trial court's finding, and (2) the record establishes that the finding is clearly wrong. Baumeister v. Plunkett, 95-2270, p. 7 (La.5/21/96), 673 So.2d 994, 998; Bailey at 4-5, 695 So.2d at 559.
We find no manifest error in the jury's finding on the medical malpractice issue in the instant case. At trial, testimony from several medical experts indicated that Touro and Dr. Mandich breached the standard of care when they failed to diagnosis Ms. Giammanchere's fractured hip, which was evident from the x-rays taken on the day of the fall. Moreover, the testimony indicated that the standard of care was also breached when Touro and Dr. Mandich failed to inform Mrs. Giammanchere of the fracture even after it was discovered by the Touro radiologist later on the day of the fall.
The failure to inform Mrs. Giammanchere was a breach of Touro's own policies and procedures, according to Debra Kriner, Touro's risk manager. The responsibility for contacting Mrs. Giammanchere fell to Dr. Mandich, Ms. Kriner stated. Ms. Kriner's testimony on this issue was corroborated by the testimony of Peter Geilich, who the court accepted as an expert in hospital policies and procedures. Mr. Geilich testified that Touro and Dr. Mandich also breached the standard of care by failing to send Mrs. Giammanchere's records to Dr. Ernst, her regular physician.

Survival Damages
La. C.C. art. 2315.1(A) provides for survival actions as follows:
If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased.
Generally, survival damages are warranted if plaintiff presents any evidence ("a scintilla") of pain or suffering on the part of the decedent. Declouet v. Orleans Parish School Board, 96-2805 (La. App. 4 Cir. 6/3/98), 715 So.2d 69, 78, writs denied, 98-2051, 98-2054, 98-2058, 98-2079 *576 (La.11/13/98), 730 So.2d 450, 451, 935, 936. Fright, fear and mental anguish during the ordeal are compensable. Id.
In the instant case, the plaintiffs presented ample evidence that Mrs. Giammanchere experienced pain and suffering as a result of the misdiagnosis of her hip fracture. The evidence presented at trial indicates that the delay in diagnosing Mrs. Giammanchere's hip fracture resulted in a six-week delay in treatment during which Mrs. Giammanchere suffered pain. Moreover, Dr. Billings testified that the delay in diagnosis probably contributed to Mrs. Giammanchere's stress and a loss of muscle tone, and that providing stability for the fracture as soon as it happened would have allowed earlier rehabilitation. Based on the above evidence, we find no manifest error in the jury decision awarding Mrs. Giammanchere $400,000 in survival damages.
Moreover, our review of the record convinces us that the Giammancheres suffered damages for loss of consortium during the six-week period between the fall and the diagnosis of the hip fracture. The record indicates that the relationships in the Giammanchere family were close and loving; Mr. Giammanchere testified that his wife was the center of the family. After Mrs. Giammanchere's fall, the record indicates, many regular family activities, including barbecues, bingo, and dinners, were discontinued. In her husband's words, "everything just fell apart." Accordingly, we amend the trial court judgment to award Mr. Giammanchere $100,000 in loss of consortium damages, and to award each of the three Giammanchere children $25,000 in loss of consortium damages. All awards are subject to the jury's apportionment of 30 percent of the fault to Mrs. Giammanchere.

Wrongful Death Damages
Wrongful death damages are governed by La. C.C. art. 2315.2(A), which provides, in pertinent part, as follows:
If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.
We find that the trial court judgment awarding the Giammancheres damages for Mrs. Giammanchere's wrongful death is manifestly erroneous and must be reversed. The testimony of the witnesses at trial, as summarized below, clearly showed that the delay in diagnosis did not cause the death of Mrs. Giammanchere.
Several physicians were called by both parties to establish the facts of the case. All of the physicians concluded that, although the delay in diagnosis caused Mrs. Giammanchere additional pain, it did not cause her death. Dr. Billings, the orthopedic surgeon who performed the hip surgery on Mrs. Giammanchere, testified that the delay in diagnosis merely changed the timing of the surgery and not the outcome. He testified as follows:
Q. It's also true that you do not believe that the delay in taking this lady to surgery, the delay in treatment of this hip fracture in any way increased her risk or likelihood for post-operative complications, isn't that true?
A. I think she would have had the same risks of surgery whether the surgery would have been done initially at the time of the fracture or at some point later.
This conclusion was supported by the testimony of Dr. Mathieu, a member of the medical review panel that initially reviewed the case. In medical malpractice cases, the medical review panel is "a body of experts assembled to evaluate the plaintiffs claim and to provide the courts and the parties with an expert opinion." Derouen v. Kolb, 397 So.2d 791, 794-795 (La. 1981). Dr. Mathieu testified:

*577 Q. It's true that the expert opinion of this medical review panel was that Mrs. Giammanchere's death and ultimate demise was in no way related to this delay in treatment for the hip fracture; isn't that correct?
A. The irony here is that there was a delay in the diagnosis and we had to consider that being fair to the patient and the patient's family, and what we found was that the patient in walking on the hip as evidenced by the record had some discomfort and that was a couple of days before the diagnosis was made, so there was a delay in the treatment and the eventual treatment was surgery. The outcome of the surgery was that in all surgeries and anesthesia there's always a risk that there's complications and this lady had a very peculiar type of blood problem where she had a lupus like clotting mechanism where she was predisposed to have strokes. She was a stroke waiting to happen. Her blood was thick. It had a tendency to clot, and after the operation she had a stroke in a very important part of the brain and the brain stem and eventually died from it. In actuality the delay in diagnosis just really prolonged the lady's life...
Dr. Mautner, another member of the medical review panel, agreed with Dr. Mathieu' testimony when he took the stand to testify as follows:
Q. Isn't it also true that the panel after reviewing these records collectively and you individually do not believe that Mrs. Giammanchere's death and demise was in any way related to the delay in treatment of the hip fracture, isn't that true?
A. That's correct.
Dr. Aaron Friedman, an expert in the field of neurology and one of Mrs. Giammanchere's former physicians, also testified regarding the causation issue.
Q. ...In your opinion as a neurologist, did that delay in surgery in any way contribute or add towards her potential to develop these complications that did develop postoperatively?
A. No. The delay in surgeryI can't see how a delay in surgery would have contributed to her having a stroke.
Q. She had the same likelihood to get these complications had the surgery been done a month or two sooner?
A. Or a month or two later.
Dr. Maureen Stein, an expert witness in the field of cardiology, testified after reviewing the medical records that she also agreed with the other physicians.
Q. In your expert opinion, was the patient's death and downhill course in any way related to this delay in treatment of the hip fracture?
A. No.
Q. Could you explain to the jury why that is?
A. The hip fracture itself did not actually precipitate her ultimate death which was due probably to a stroke. A stroke appears to have occurred at the time or shortly after the time of her surgery for the hip fracture which we see not uncommonly in patients that have severe disease in their blood vessels and have to undergo a surgical procedure that seems to precipitate problems with blood flow to varying parts of the body, and in patients that have severe disease particularly to the blood vessels to the brain, it can cause strokes.
Q. And she had this severe vascular disease long before she fell?
A. Predating the fall.
Q. And she also had a history of prior accidents, of cerebral accidents?
A. Yes.
In short, all of the experts at trial agreed that the delay in diagnosis was not a cause of the death of Mrs. Giammanchere. Accordingly, the trial court judgment *578 awarding Mr. Giammanchere and the Giammanchere children damages for Mrs. Giammanchere's wrongful death is reversed.

Dr. Ernst's Liability
The jury concluded that Dr. Ernst was not liable for failing to obtain Mrs. Giammanchere's emergency room records. The plaintiffs have appealed this decision and request that Dr. Ernst be held liable for damages. The jury was presented with conflicting testimony regarding Dr. Ernst's actual knowledge of the hip injury and whether he was aware of the existence of the x-rays. Where the factfinder is presented with two permissible views of the evidence, the choice between them cannot be manifestly erroneous or clearly wrong. Housley v. Cerise, 579 So.2d 973 (La.1991); Rosell v. ESCO, 549 So.2d 840 (La.1989). Accordingly, the jury's finding that Dr. Ernst was not liable is affirmed.

Conclusion
For the reasons described above, the exception of res judicata filed by the LPCF is denied. The jury's finding that Touro and Dr. Mandich committed medical malpractice is affirmed, as is the award to Ms. Giammanchere of $400,000 in survival damages. The judgment is amended to award Mr. Giammanchere $100,000 in loss of consortium damages, and to award each of the Giammanchere children $25,000 in loss of consortium damages. The jury's finding that Dr. Mandich's negligence caused Ms. Giammanchere's death and awarding wrongful death damages to the Giammancheres is reversed. The total award is $575,000, reduced by Mrs. Giammanchere's 30 percent fault to $402,500 plus legal interest from the date of judicial demand. The jury finding that Dr. Ernst was free from fault is affirmed. All costs are assessed to the LPCF.
AFFIRMED IN PART; REVERSED IN PART; AMENDED.
JONES, J., dissents with reasons.
JONES, J., dissenting.
The award to Mr. Giammanchere in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000) for loss of consortium damages is clearly excessive. Thus, I must dissent.
Likewise, the award to each of the Giammanchere children in the amount of TWENTY-FIVE THOUSAND DOLLARS ($25,000) for loss of consortium damages is also excessive. The majority awards these sums to Mr. Giammanchere and his children for a "six-week period between [Mrs. Giammanchere's] fall and the diagnosis of the hip fracture." Neither the majority, nor I, have any authority for such a generous award. Hence, for these reasons, I dissent.

ON REHEARING
PER CURIAM.
We issue this per curiam opinion on rehearing for the sole purpose of considering the exception of no cause of action filed in this court by defendant, Louisiana Patient's Compensation Fund ("LPCF"). Finding that the plaintiffs have a cause of action against the LPCF, the exception is denied for the reasons set forth below.
Under the provisions of the Louisiana Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq., the total amount recoverable by a plaintiff alleging damages used by medical malpractice is limited to $500,000 plus interest and costs. LSA-R.S. 40:1299.42(B)(1). Of that amount, a qualified health care provider may be liable for $100,000 plus interest. LSA-R.S. 40:1299.42(B)(2). Any amount due from a judgment or settlement in excess of the total liability of the qualified health care providers must be paid by the LPCF. LSA-R.S. 40:1299.42(B)(3)(a).
The LPFC's liability in this case is grounded in the liability of defendant, Dr. Milijana Mandich, a qualified health care provider with whom the plaintiffs settled prior to trial for $31,500. Following settlement *579 with Dr. Mandich, the plaintiff proceeded to trial against another medical provider, Dr. John Ernst. After a six-day trial, the jury returned a verdict in favor of the plaintiffs for a total of $800,000, which was reduced to the $500,000 limit of liability under the Medical Malpractice Act. The jury apportioned 60 percent of the fault for the plaintiffs' damages to Dr. Mandich. Thereafter, the LPCF intervened in the action and appealed the judgment. The LPCF filed an exception of no cause of action in this court.
The LPFC's exception of no cause of action is based on its contention that the plaintiffs lost their right to proceed against the LPFC for recovery when they failed to follow the requirements established by LSA-R.S. 40:1299.44(C), which provides, in pertinent part, as follows:
C. If the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient's compensation fund for a complete and final release, then the following procedure must be followed:
(1) A petition shall be filed by the claimant with the court in which the action is pending against the health care provider, if none is pending in the parish where plaintiff or defendant is domiciled seeking (a) approval of an agreed settlement, if any, and/or (b) demanding payment of damages from the patient's compensation fund.
(2) A copy of the petition shall be served on the board, the health care provider and his insurer, at least ten days before filing and shall contain sufficient information to inform the other parties about the nature of the claim and the additional amount demanded.
Specifically, the LPCF claims that the plaintiff failed both to file a petition for court approval of the settlement and to serve the petition on the LPCF.
The plaintiffs concede that they failed to meet the requirements of LSA-R.S. 40:1299.44(C), but claim that LSA-R.S. 40:1299.44(C) does not apply under the circumstances of the instant case. Instead, the plaintiffs claim that they were required only to meet the more general requirements established by LSA-R.S. 40:1299.42(D)(5), which provides as follows:
In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient's compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the amount of malpractice liability insurance in force as provided for in R.S. 40:1299.42(B)(2).
Determination of whether LSA-R.S. 40:1299.44(C) or R.S. 40:1299.42(D)(5) applies to the instant case depends on this court's interpretation of the Louisiana Supreme Court's decision in Horil v. Scheinhorn, 95-0967 (La.11/27/95), 663 So.2d 697. In that case, the plaintiff had settled his case against the qualified health care provider for the full $100,000, and had subsequently sought additional damages from the LPCF. The court held "that a claimant expecting excess recovery from the Fund must closely follow La. R.S. 40:1299.44(C) when requesting court approval of a settlement." Id. at 1, 663 So.2d at 698 (emphasis added). However, the plaintiffs argue that the Horil decision should not be interpreted to require compliance with LSA-R.S. 40:1299.44(C) under the circumstances of this case because they did not expect the recover excess damages from the LPCF. In support of this argument, they note that their settlement with Dr. Mandich was for $31,500, an amount far less than the $100,000 limit of liability applicable to Dr. Mandich.
*580 However, the LPCF correctly points out that the Louisiana Third Circuit Court of Appeal has interpreted Horil to require compliance with the provisions of LSA-R.S. 40:1299.44(C) anytime a plaintiff attempts "to obtain excess damages from the PCF." Castille v. Our Lady of Lourdes Regional Medical Center, 96-1476, p. 3 (La.App. 3 Cir. 4/2/97), 692 So.2d 1303, 1305. In that case, the plaintiff settled his claim with the qualified medical provider for $75,000 in a settlement which was approved by the court and which contained a reservation of rights against the LPCF. Id. at 1, 692 So.2d at 1304. The plaintiffs also amended their original petition to name the LPCF as a defendant; however, the requirements of LSA-R.S. 40:1299.44(C) were not met. The Third Circuit affirmed a trial court judgment granting a summary judgment in favor of the defendant in Castille, stating as follows:
The [] provisions [of LSA-R.S. 40:1299.44(C)] require that the board be served with a copy of the petition for approval of a settlement including any demand for payment of excess damages from the fund, and that the PCF be given an opportunity to introduce evidence at the hearing on that petition. In this case, the PCF was not given notice prior to the hearing on the settlement and was not given an opportunity to present evidence with regard to the demand for excess damages. As the supreme court stated in Horil[ v. Scheinhorn], 95-0967 (La.11/27/95); 663 So.2d 697, there is no provision for a separate settlement vehicle. The plaintiffs here in did not comply with the provisions of La. R.S. 40:1299.44(C). As a result, under the holding of Horil, 95-0967; 663 So.2d 697, the trial court correctly dismissed the plaintiffs' claims against the PCF.
The LPCF claims that the facts of the instant case are virtually indistinguishable from the facts of Castille.
However, we believe this case involves an important factual distinction from the Castille case. In Castille, the plaintiff obviously intended and expected to receive excess damages from the LPCF, as evidenced by the fact that the plaintiff amended his petition to add the LPCF immediately after the settlement. However, in the instant case, there is no evidence that the plaintiffs intended and/or expected to receive excess damages from the LPCF. In fact, the plaintiffs in this case settled their claim against Dr. Mandich for only $31,500, an amount far below the $100,000 limit of liability. The plaintiffs obviously believed that the greater amount of liability in this case lay with Dr. Ernst; the jury saw the facts differently.
Moreover, we agree with the plaintiffs' argument that nothing in the Horil decision requires that the plaintiffs in the instant case meet the requirements of LSA-R.S. 40:1299.44(D) or suffer dismissal on an exception of no cause of action. The Horil decision clearly refers only to situations where the plaintiff intends and/or expects to recover excess damages from the LPCF. For example, the decision states, in pertinent part as follows:
Recently, in Russo v. Vasquez, 94-2407, pp. 5, 6 (La.01/17/95), 648 So.2d 879, 882, we outlined the purpose and requirements of La. R.S. 40:1299.44(C). We noted there that, where a provider's insurer agrees to settle a claim against its insured but the claimant demands, from the Fund, an amount exceeding the $100,000 paid by the insurer, this statute requires the claimant to utilize a specific procedure. First, the claimant must file a petition seeking approval of the settlement and demanding additional damages from the Fund. La. R.S. 40:1299.44(C)(1). The Fund's oversight board must be served with a copy of that petition at least ten days prior to the filing, La. R.S. 40:1299.44(C)(2), and may within twenty days agree or object to the amount demanded, La. R.S. 40:1299.44(C)(3). Then, if the oversight *581 board, the claimant, and the insurer of the health care provider cannot agree on the amount to be paid by the Fund, the court must conduct a trial to determine the amount of the victim's damages exceeding the sum already paid by the health care provider or his insurer. La. R.S. 40:1299.44(C)(5). Where the insurer has paid its policy limits of $100,000, the court shall consider the liability of the provider as admitted and established for purposes of approving a settlement or determining the amount, if any, to be paid by the Fund. La. R.S. 40:1299.44(C)(5).
In the case sub judice, by viewing Horil's 1985 settlement as not then implicating the Fund and as being narrowly controlled by La. R.S. 40:1299.42(D)(5), the court of appeal disregarded the special requirements of La. R.S. 40:1299.44(C). In instances where the claimant expects to ultimately recover from the Fund despite his settlement of the provider's liability, this latter statutory provision mandates the procedure that the claimant must closely follow. In the present matter, at the time of seeking court approval of his settlement with the named defendants, Horil obviously sought to reserve his right to further recovery from the Fund. In such circumstances, La. R.S. 40:1299.42(D)(5) does not license a separate settlement vehicle. Instead, it is clear that the specifics of La. R.S. 40:1299.44(C) govern.
95-0967 at 5, 663 So.2d at 700 (footnote omitted). Thus, we find that Horil requires compliance with the procedural requirements established by LSA-R.S. 40:1299.44(C) only when the circumstances indicate that the plaintiff expected and/or intended to recover excess damages from the LPCF.
In circumstances, such as the instant case, where the plaintiff clearly did not expect or intend to recover excess damages from the LPCFand especially where, as here, the settlement with the qualified health care provider is far less than the $100,000 limitthe provisions of LSA-R.S. 40:1299.42(D)(5) apply. This conclusion is based on the language of LSA-R.S. 40:1299.44(C) and the Supreme Court's decision in Horil, and on consideration of the well-accepted rule of statutory construction which demands that courts give effect to all language where possible. See In re Succession of Toncrey, 98-2342, p. 2 (La.App. 4 Cir. 12/9/98), 725 So.2d 59, 60. If we applied LSA-R.S. 40:1299.44(C) to the instant case, LSA-R.S. 40:1299.42(D)(5) would have no effect
Thus, the final question to be decided is whether the plaintiffs in the instant case fulfilled the requirements of LSA-R.S. 40:1299.42(D)(5). The LPCF suggests that the plaintiffs did not meet the requirements of that provision because the record contains no evidence that the LPCF was given notice of the plaintiffs' settlement with Dr. Mandich. The LPCF also suggests that any notice received was "insufficient." However, as noted by the plaintiffs, LSA-R.S. 40:1299.42(D)(5) contains no time limit for giving written notification of a plaintiff's settlement with a qualified health care provider to the LPCF. Moreover, the form of the notice is not specified.
In the instant case, the fact that the LPCF received notice of the settlement with Dr. Mandich is easily inferred. Most importantly, the lawyers who represented Dr. Ernst at trial are members of the same firm as the lawyers that represent the LPCF on appeal. Moreover, the petition for intervention filed by the LPCF on June 28, 1996 references the May 24, 1995 settlement with Dr. Mandich. Under the circumstances, we find that the requirements of LSA-R.S. 40:1299.42(D)(5) were met. Accordingly, the exception of no cause of action filed by the LPCF is DENIED.
JONES, J., concurs.
*582 JONES, J., concurring.
I concur with the majority that the application for rehearing should be granted, but disagrees with the opinion of the majority in denying relief to the appellant. Thus, because I continue to believe the majority is wrong in their generous award of damages, I would grant the application for rehearing and render accordingly.