MAX N. TOBIAS, JR., JUDGE.
hThe plaintiff, Emanuel Bridgewater, appeals the granting of summary judgment in favor of the defendants, New Orleans Regional Transit Authority (“RTA”) and the City of New Orleans (“City”); dismissing his claims for personal injuries sustained when he was allegedly run over by a RTA bus. The RTA answered the appeal requesting attorney’s fees and costs ■against Mr. Bridgewater for filing a frivolous appeal. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Facts and Procedural Background

Mr. Bridgewater claims that on 29 August' 2003, while ■ reclining on the neutral ground (median) located at the intersection of Washington Avenue and South Dorge-nois Street in New Orleans, his right arm and right leg were run over by a RTA bus. According to Mr. Bridgewater, Louisiana ■Avenue Bus.-No. 27 was traveling river-bound,. and as it made a left turn off of Toledano Street and an immediate right turn onto Washington Avenue,[1] the bus cut the corner too closely causing it to go up onto the neutral ground where he was reclining with the front tire of the bus striking him on his right arm, breaking it and leaving a tire-mark | ^impression, and the right rear tire rolling over his right knee causing injury. He further contends that, at the time of the accident, the neutral ground was .overgrown with weeds and small trees making it visibly hard to see him as he lounged there. Mr. Bridgewa-ter avers that the bus driver did not stop, but rather, fled the scene after the accident.
A male bystander, who, according to the record on appeal,, did not actually witness the accident but was walking.on South Dorgenois Street towards Washington Avenue, heard Mr. Bridgewater calling out for help. The bystander, later identified as Joe Myles,[2] then-17 years old, assisted Mr. Bridgewater by calling 911 for emergency assistance. Shortly thereafter, an ambulance arrived op the scene followed by Officer Roger Smith, a policeman with the New Orleans Police Department (“NOPD”) assigned., to the RTA. Mr. Bridgewater contends that prior to his being transported by the ambulance to Charity Hospital, the NOPD officer failed to question him concerning the accident. At Charity, Mr. Bridgewater claims he was treated for his broken wrist and leg injury, both of which he maintains have rendered him permanently disabled.[3] Though Mr, Bridgewater, avers that be had not consumed any alcohol within, twelve hours of the accident, the Charity records indicate that his blood alcohol level (obtained four hours after the accident) was measured at 0.132.
In’ August 2004, Mr. Bridgewater filed suit for damages against the RTA and the City alleging their joint and several liabili *411 ty on the ground that the City was a | .¡partner with the RTA in running the bus operation. Thereafter, he filed a-first amending and supplemental petition adding as a defendant, TMSEL (Transit Management of Southeast Louisiana, Inc.), reiterating his allegations of the joint liability of the parties,[4] and stating that the NOPD officer, who was assigned exclusively to the RTA, acted “in. concert” with RTA/TMSEL' employees to protect the RTA from liability “by hiding or failing to perform their assigned duties.” Further, Mr. Bridgewater averred that the City was liable to him for his injuries based on its failure to place proper signage in the area of the accident warning the public that buses might, run off the road and strike pedestrians, and for its failure to properly design rest areas so as to protect the public from dangers that were not open and obvious.
The City filed a motion for summary judgment on 10 August 2005, but due to the devastation caused by Hurricane Katrina, the hearing thereon never took place. Thereafter, in September 2014, the City’s motion was reset for hearing on 10 October 2014, at which time the City’s motion for summary judgment was granted. Mr. Bridgewater subsequently-filed a motion for rehearing, which was treated by the trial court as a motion for new trial. Additionally, on 31 October-2014, the RTA filed a motion for summary judgment on liability. Mr. Bridgewater’s motion for rehearing [new trial] on the City’s motion for summary judgment and the RTA’s motion for summary judgment both came for hearing on 8 May 2015. At the close of oral argument, the trial judge denied the motion for rehearing on the City’s motion for summary judgment and granted the RTA’s motion for summary-judgment'on the issue of liability. A judgment to this effect |4was issued on 18 May 2015. In response to Mr. Bridgewater’s request pursuant to La. C.C.P. art,1917, written reasons for judgment were -issued on 15 June 2015.
'Mr.' Bridgewater appeals the trial court’s 18 May 2015 judgment. The RTA answered the appeal seeking attorney’s fees and costs against Mr. Bridgewater for the filing of a frivolous appeal.

Issues Presented for Review

On appeal, Mr. Bridgewater contends the trial court erred in granting the motions for summary judgment in favor of the City and the RTA because genuine issues of material fact remain regarding the accident,, which require a trial on the merits in this case. Additionally,, Mr. Bridgewater argues the trial judge misapplied the law concerning expert opinion.

Standard of Review and General Principles of Summary Judgment

As has been written many times before, a summary judgment is subject to de novo review on appeal, using the same standards applicable to the trial court’s determination of the issues. Hayes v. Sheraton Operating Corp., 14-0675, p. 3 (La.App. 4 Cir. 12/10/14), 156 So.3d 1193, 1196. The summary judgment procedure is expressly favored in the law and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966 A(2). Its purpose is to pierce -the pleadings and to assess the proof in order to see whether there exists a genuine need for trial. Hines v. Garrett, 04-0806, p. 7 (La.6/25/04), 876 So.2d 764, 769. Summary judgment is appropriate if the pleadings, depositions,' answers to interrogatories, admissions, and affidavits in *412 the record show that no genuine issue of material fact exists and" that the mover is entitled to |,-judgment as a matter of law. La. C.C.P. art. 966 B(2);[5] see also- La. C.C.P. art.- 966 A(3). The-burden of proof rests with the moving party and all doubts should be resolved in favor of the .non-moving party. Gailey v. Barnett, 12-0830, p. 4 (La.App. 4 Cir. 12/5/12), 106 So.3d 625, 627-28.
Once a prima facie showing has been established by the mover that the motion for summary judgment should be granted, the burden then shifts to the non-moving party to present evidence demonstrating that genuine issues of material fact remain; failure to do so mandates the granting of the motion. La. C.C.P. art. 966 C(2); Schultz v. Guoth, 10-0343, pp. 6-7 (La.1/19/11), 57 So.3d 1002, 1006; Hayes, 14-0675, pp. 3-4, 156 So.3d at 1196; Smith v. Treadway, 13-0131, p. 4 (La.App. 4 Cir. 11/27/13), 129 So.3d 825, 828. In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the-truth of the matter,- but instead, to determine whether a genuine issue of material fact exists. Hines, 04-0806, p. 1, 876 So.2d at 765. A “genuine issue” is a triable issue,, or one.as to which reasonable persons could disagree. 1026 Conti Condominiums, LLC v. 1025 Bienville, LLC, 11-1055, p. 5 (La.App. 4 Cir. 2/8/12), 84 So.3d 778, 781; Smith v. Our Lady of the Lake Hosp., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751. Similarly, a fact is “material” when its -existence or non-existence- may “insure or preclude recovery, affect a litigant’s ultimate-success, or determine the outcome of the legal dispute.” Hayes, 14-0675, pp. 3-4, 156 So.3d at 1196; FMC Enterprises, L.L.C. v. Prytania-St. Mary Condominiums Ass’n, Inc., 12-1634, p. 6 (La.App. 4 Cir. 5/15/13), 117 So.3d 217, 222. Despite the legislative mandate that summary judgments are favored, any doubt as to a | ^dispute, regarding a material issue of fact must-be = resolved against granting the motion and in favor of a trial on the merits, Willis v. Medders, 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050; FMC Enterprises, 12-1634, pp. 6-7, 117 So.3d at 222-23; Windham v. Murray, 06-1275, p. 3 (La.App. 4 Cir. 5/30/07), 960 So.2d 328, 331.

Discussion

Liability of the City

The trial court granted the City’s motion for. summary judgment on the grounds that (1) the City did not- have care, custody/ or control over the RTA/ TMSEL or any of its buses or operators, (2) the NOPD officer investigating the-incident prepared a report which was satisfactory based upon the information he was given, and (3);.the City had no duty to place signs.to warn the public..that a bus m.ay run off the road and .strike pedestrians. . Finding that its prior judgment was not contrary to -the law and evidence and that no new evidence .was presented, the trial court denied,Mr. Bridgewater’s motion for rehearing. Specifically, the.court determined that -the only legal duty a police officer has in investigating an accident is to provide the identity ,of the. parties involved so. as to facilitate civil claims. -See. La. R.S. 32:398 D. Having found that the NOP.D investigating officer, Roger Smith, properly discharged, his legal duty in the preparation of the subject report, the trial court determined summary judgment in favor of the City was proper. .We agree. Accordingly, we affirm.that portion of the trial court judgment denying Mr. Bridge-water’s motion for rehearing of the earlie? *413 judgment granting th'e City’s motion for summary judgment.
Pursuant to La. C.C. art. 2317, “[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of 17persons for whom we are answerable, or of the things which we have in our custody.” This theory of strict liability is applicable where damages are caused by instrumen-talities in one’s custody or control. Petre v. State ex rel. Dept. of Transp. and Development, 01-0876, pp. 4-5 (La.4/3/02), 817 So.2d 1107, 1110. In Petre, 'the Court found that La. R.S' 9:2800 limited the liability of public entities for damages arising out of its care and custody of public property. Id. Under La. R.S. 9:2800, no person shall have a cause of action based on liability under article 2317 against a public entity for damages caused by the condition of things in its care unless the public entity had actual or constructive notice of the particular defect that causfed the damage prior to the occurrence and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so. As a political subdivision of the state, the City is subject to limited liability under La^ C.C. art. 2317 by virtue of La. R.S. 9:2800.[6] Since La. R.S. 9:2800 limits the liability of | apolitical subdivisions of the state with regard to strict liability, the duty owed by the City under the theories of strict liability and negligence, if any, is the sama
In order to recover against a political subdivision of the state, such as the City, the plaintiff must prove that (1) the thing which caused the damage was owned or in the custody of the public entity;' (2) the thing was defective due to a condition creating an unreasonable risk of harm; (3) the entity had actual or constructive notice of the defective condition yet failed to take corrective action within a reasonable period of time; and (4) the defect was a cause of the plaintiffs harm. Jones v. Hawkins, 98-1259, p. 4 (La.3/19/99), 731 So.2d 216, 218; Wilson v. City of New Orleans, 95-2129, p. 3 (La.App. 4 Cir. 4/30/97), 693 So.2d 344, 346. It follows, therefore, that a public entity is not responsible to another for damages caused by things that are not under its care, custody, or -control.
Applying La. R.S. 9:2800 to the facts presented by the case sub judice, in order *414 for Mr. Bridgewater to have defeated the City’s motion for summary judgment, he was first charged with establishing that the City had custody, care, and control over the RTA/TMSEL or its buses and/or the bus operator that allegedly struck and injured him. This Mr. Bridgewater failed to do. His only proof consisted of the allegations set forth in his original and first supplemental and amending petitions that the City and the RTA/TMSEL were “partners in running the bus operation.”
|3In 1979, the RTA was created by the legislature; La. R.S. 48:1654, states:
A. There is hereby created the Regional Transit Authority, subject to the conditions hereinafter set forth, which shall be a body politic and corporate and a political subdivision of the state of Louisiana comprising all of the territory in the parishes of Jefferson, Orleans, St. Bernard, and St. Tammany, or of such of the aforesaid or other parishes as elect to participate in the authority. The domicile of the authority shall be the parish of Orleans, but may be situated in one of the other participating parishes but only by the affirmative vote of a majority of the total weighted vote of authority.
B. The purpose for which the authority is created is to plan, design, lease as lessee, purchase, acquire, hold, own, construct, improve, have an equity in, finance, maintain, and administer a transit system within the metropolitan area to operate same or contract therefor, lease as lessor same for operation by private parties.
By virtue of La. R.S. 48:1654, the legislature conferred upon the RTA, the care, custody, and control of the public transit system in Jefferson, Orleans, St. Bernard,- and St. Tammany Parishes, a system over which the City has no control. Moreover, Mr. Bridgewater alleged in his petitions that the RTA bus that struck and injured him was owned by RTA/TMSEL and operated by an employee of RTA/TMSEL. Absent proof of control by the City over the RTA/TMSEL, the City cannot be held liable to Mr. Bridgewater for any acts of negligence caused by the RTA or any of its employees. The trial judge did not err in its finding that the City did not have care, custody, or control over the RTA/TMSEL, its buses or bus operators.
Next, in order to prevail on his claim that the City, was responsible to him for the damages he sustained in the accident for its failure to place proper signage in the area of the accident warning the public that a bus might run off the road and strike pedestrians who are lounging near the curb of the neutral ground, Mr. | inBridgewater was charged with establishing that the City had a duty to position such signs. The trial court determined that under the facts and circumstances of this case, the City had no such a duty. We agree.
In order to determine whether liability exists under the facts of a particular case, a court employs a duty-risk analysis on a case-by-case basis. McGuire v. New Orleans City Park Improvement Ass’n., 02-1401, pp. 6-7 (La.1/14/03), 835 So.2d 416, 420-21. Under the duty-risk analysis, a plaintiff must satisfy the following elements to-establish liability: (1) the conduct in question was the cause-in-fact of the resulting harm, (2) the defendant owed a duty of care to the plaintiff, (3) the defendant breached the duty owed, and (4) the risk of harm was within the scope of protection afforded by the duty breached. Id. (citing Pitre v. Louisiana Tech University, 95-1466, p. 8 (La.5/10/96), 673 So.2d 585, 589-90). If the plaintiff fails to satisfy even one of the elements of duty-risk, the defendant is not liable. Pitre, 95-1466, p. 9, 673 So.2d at 590. Duty is a question of *415 law: the inquiry .is whether the plaintiff has any law (statutory or jurisprudential) to support his claim that the defendant owed him a duty. Faulkner v. The McCarty Corporation, 02-1337, pp. 4-5 (La.App. 4 Cir. 6/11/03), 853 So.2d 24, 28. Absent a duty to the plaintiff, -there can be no actionable negligence and, hence, no liability. Polk v. Blanque, 93-1740 (La.App. 4 Cir. 3/15/94), 633. So.2d 1382, 1387. Municipalities may be subjected to the imposition of duties by legislation, ordinance or rule of law, the breach of which may result in liability for damages to those injured by a risk contemplated by that duty. Cormier v. T.H.E. Ins. Co., 98-2208, p. 7 (La.9/8/99), 745 So.2d 1, 8. The role of the court is to determine whether any jurisprudential or statutory rule exists, or any policy reason why, under the facts and circumstances of the case,, the City would owe a duty to 11t compensate the plaintiff for his injuries. Id., 98-2208, pp. 7-8, 745 So.2d at 8. Additionally, under Louisiana law, a defendant generally does not have a duty to protect against an open and obvious hazard. •' Broussard v. State ex rel. Office of State Bldgs., 12-1238, p. 10 (La.4/5/13), 113 So.3d 175, 184.[7]
In support of the City’s position that it did not have a duty to place signage warning of the danger that a bus could leave the road and potentially strike a pedestrian, the City presented the affidavit of Peter Lollis, a Publiq Works Department Traffic Sign Shop Acting Supervisor for the City. Mr. Lollis stated that, in his position, he is familiar with the types of traffic signs that are placed throughout the City by the Department of Public Works, and in his review of the Department’s réc-, ords, he could find no record, nor was he aware of the existence of any sign ever posted by the City that warns of the possibility that a bus could run off the road, strike a pedestrian, and cause injury. To controvert the City’s position, Mr. Bridge-water presented no statutory or jurisprudential rule imposing such a duty upon the City to place such- signage.- Moreover, we find that,- under the circumstances of this case, as evidenced by the photographs contained in the record.,on appeal depicting the intersection at issue as well as the neutral ground upon which Mr. Bridgewa-ter was resting,.the potential danger complained of. by Mr. Bridgewater is a danger or hazard that is apparent or observable by any reasonable person who chooses to rest near the curb of a' neutral ground situated in-the middle'of a major thoroughfare often traversed by public buses. Accordingly, we find the | ¶¿trial' court did not err in its determination that the City owed no duty to Mr. Bridgewater to place warning signs alerting the public of the open and obvious danger presented in this ease.
■ On appeal, Mr. Bridgewater also argues that the City was responsible for the neutral ground upon which he was resting and, due to the overgrowth and/or height of the grass, ■ the bus driver’s view and ability to see him was obstructed; The record is devoid of any evidence, other than Mr. Bridgewater’s assertions, that the grass on the neutral ground was high and/or that the bus driver’s view of the area was obstructed, making it hard to see Mr, Bridgewater resting there. Furthermore, the record contains no evidence that the City had the care, custody, and/or con *416 trol of this particular neutral ground or was charged with the duty of maintaining it. We find that no genuine issue of material fact exists regarding this issue. -
Mr. Bridgéwater further argues that the trial court erred in determining that “the only legal duty the police have in investigating an accident- is tó provide the identity of the parties involved' to facilitate civil claims,” and finding that Officer Smith fulfilled his duty; The duty a police officer has regarding the iiivestigations of accidents is set forth in La. 'R.S. 32:398 D,[8] which requires the investigating | ^officer to investigate all accidents required to be reported by . that section. The purpose of La. R.S. 32:398 D is to facilitate civil claims .that might arise from automobile accidents. Bass v. Daves, 32,655, p. 4 (La.App. 2 Cir. 3/3/00), 753 So.2d 991, 993. Our review of the affidavit of Officer Rogers and the accident report he prepared on the date of the accident leads us to the same conclusion reached by the trial court; that, is, Officer Rogers conformed to the legal duty involved in accident investigation in this case.[9] Mr. Bridgewater’s claim for damages against the City and the RTA/TMSEL. was based on the accident and the information-provided in the report confirming that his ability to pursue his claims had not been impaired. Accordingly, we find no error in the trial court’s determination regarding the investigation of the accident.
Finding that no genuine issue of material fact exists and that reasonable minds could not differ as to absence of the City’s liability to Mr.' Bridgewater in this case, we affirm the trial court’s judgment dismissing Mr. Bridgewater’s .claims against the City on summary judgment.

Liability of the RTA

In its reasons for judgment granting-the RTA’s motion for summary judgment on the issue of liability, citing La. C.C.P. art. 966 C(2), the trial court stated that it granted the RTA’s motion “on the grounds that Mr. Bridgewater had [14no evidence to establish that the actions of the RTA were a cause in fact of his damages.” -Specifically, the trial court stated:
[0]n the issue of'cause in fact, RTA - submitted an affidavit dated August 5, 2005[,] from Dr. David Aiken, Jr., a *417 board certified Orthopedist. In his affidavit, Dr. Aiken averred that he had reviewed Mr. Bridgewater’s medical records and he opined that the injures to Mr. Bridgewater’s arm and knee were not caused by having been run over by a bus. In fact, he stated that “it is medically and physically impossible for a bus to have run'.over plaintiffs right arm and leg”; and that had Mr. Bridgewater been run over by' a bus,' he “would have sustained much more serious fractures” and “he would have been left with permanent visible scars.” To date, Mr. Bridgewater has no expert to refute this report nor has he ever deposed Dr., Aiken. Instead, in an attempt to refute this evidence, Mr. Bridgewater submitted his affidavit wherein he averred that he was run over by a bus. [Citations omitted.]
, As support for its judgment in favor .of the RTA, the trial court determined that the case of Jones v. Estate of Santiago, 03-1424 (La.4/14/04), 870 So.2d 1002, was on point. Specifically, the trial court stated,. “[i]n Jones, supra, the Louisiana State Supreme Court .. .> .held that summary judgment was warranted when a plaintiff has only conclusory, speculative testimony and the physical evidence is uncontrovert-ed.”
On appeal, Mr; Bridgewater- argues the trial court erred in its conclusion that no genuine issues of material fact remain regarding the RTA’s liability to .him for the accident and his resulting injuries. Conversely, the RTA contends that, because Mr. Bridgewater has failed to retain an expert to contradict Dr. Aiken’s report that-opined it was medically and physically impossible for Mr. Bridgewater to have been run over by a bus, summary judgment dismissing his' claims was proper. The 11SRTA further avers that Mr. Bridge-water’s recollection of the alleged accident and how. it happened are not credible due to his-untruthfiilness about his alcohol-intake in the hours preceding the accident, and his “severe” level of intoxication at the time the- accident purportedly occurred.
While we would agree with the trial court that under Jones v. Estate of Santiago, summary judgment is warranted in those cases where the physical evidence is “uncontrovérted” and the only testimony relied upon by the plaintiff to defeat the motion is at best conclusory or speculative, our de novo review of the evidence leads us to a result that differs from that of the trial court. Simply put, we find that Mr. Bridgewater’s failure to retain an expert to refute the expert opinion óf Dr. Aiken is not fatal to his claim; Mr. Bridgewater’s medical records standing alone contradict or conflict with Dr. Aikén’s affidavit and expert medical record review report creating a genuine issue of material fact' upon which - reasonable minds could differ regarding Mr. Bridgewater’s accident and injuries.
Specifically, Dr. Aiken opined that “[i]f [Mr. Bridgewater]’s right arm and leg were run over by a bus he would have sustained much more severe fractures to those areas instead of just two cracked bones in the right hand, and he would have been left- with permanent' visible scars.” Dr. Aiken provided a sulnmary of'his review of Mr. Bridgewater’s medical records that led him to this conclusion. In summarizing' Charity Hospital’s initial emergency room record; Dr. Aiken stated that “[a] fat fluid level was seen in the [right] knee joint on x-ray, but no fracture ” [emphasis added]. Dr. Aiken’s report further noted that. Mr. Bridgewater' was seen at the oüt-patient clinic on 3 September 2003, and that no right knee pain was recorded, but x-rays of, his right, leg were obtained. Dr. Aiken did not include the findings, if *418 any, on x-ray. Next, Dr. Aiken- noted that Mr. Bridgewater was-, again leseen in Charity’s out-patient' clinic on 1 October 2003. Regarding Mr. Bridgewater’s right knee, Dr. Aiken provided that his “range of motion was found to be 5 degrees to 120 degrees with tenderness to palpation,- with no effusion and no ligament laxity.” Dr. Aiken’s report made no further mention of Mr. Bridgewater’s right knee and leg. Instead, Dr. Aiken emphasized that Mr. Bridgewater, who claimed to have had no alcoholic beverages in the twelve , hours preceding the accident, had a blood alcohol level of 0.132 when, tested in the emergency room, four hours after the accident, suggesting to. him that Mr. Bridgewater was severely intoxicated at the time of the accident. In Dr. Aiken’s opinion, Mr. Bridgewater’s . intoxication — coupled with his failure to be forthcoming about it— completely discredited his testimony concerning the extent of his injuries and how the accident, happened. Consequently, Dr. Aiken concluded that it was “medically and physically impossible” for Mr. Bridgewater to have been run over by a bus.
Our .review of those same medical records, however, leads us to a different conclusion. Specifically, the medical records reveal that the .fractures Mr. Bridgewater sustained from the accident were not limited to just his right hand as Dr. Aiken posited, but rather, also included two fractures ;to his right leg, which, curiously, were completely omitted from Dr. Aiken’s medical summary report. On the, date of the accident, Mr. Bridgewater was transported to Charity Hospital’s emergency room where he stated that he was run over by a bus and was complaining of right arm and right knee pain. On physical examination, “mild supra-patellar effusion” (ie., swelling), “patella .displace[ment]” and “abrasions” of his right leg were observed; x-rays of his right leg were obtained. Contrary to Dr. Aiken’s summary that no fracture was observed on x-ray, the reviewing 117radiologist’s impression on the date of the accident was “[a] fat fluid level qn the cross table lateral suggesting an occult fracture” [emphasis added].[10] A CT-scan for further evaluation was recommended that day, but was never obtained. Additionally, x-rays of Mr. Bridgewater’s right forearm showed “soft tissue swelling,” but no fractures, and x-rays of his right, hand revealed two fractures (a fracture through the base of the second metacarpal and a fracture of the trapezium). Additionally, the medical records confirm that Mr. Bridgewater was evaluated' at Charity Hospital’s out-patient clinic five days' after the accident on 3 September 2003. In the section of Charity’s record entitled “Chief Complaint,” it states that Mr. Bridgewater was there for a follow-up “after being hit by a bus” and he was sent to radiology for x-rays of his femur and tibia/fibula. Oh examination, mild swelling was noted. The radiologist reviewing the x-rays of his right leg on 3 September 2003 (different from the reviewing radiologist on 29 August 2003) found no fractures, but noted the presence of “soft tissue swelling.” The records show that Mr. Bridge-water returned to Charity Hospital four *419 weeks later, on 1 October 2003, with continued complaints of right hand -and right knee pain., Additional x-rays of .his right hand were obtained revealing the two previously diagnosed fractures. Also, “multi-, pie views of the right knee” were taken and, on this occasion, the reviewing radiologist (also different from the reviewing radiologists on 29 August and 3 September 2003), found that Mr. Bridgewater had actually sustained two fractures to his right leg: “[fjractures of the lateral femoral | iscondyle and [of the] proximal fibula.” Radiographic evidence of the appearance of these two fractures four weeks post-accident is consistent with the initial reviewing radiologist’s suspicions on the date of the accident of an “occult fracture” to Mr. Bridgewater’s right leg.[11] Dr. Aiken’s summary of Mr. Bridgewater’s medical records makes no reference whatsoever to the two fractures to Mr. Bridgewater’s right leg that, according to the medical records contained in the record on appeal, he clearly sustained following this accident. This blatant ■ omission - creates a hsgenuine issue of material fact regarding the reliability and credibility of Dr. Aiken’s expert medical opinion that, based on Mr. *420 Bridgewater’s “minor” •' -injuries (which, contrary to Dr. Aiken’s medical summary report, amounted to - two. factures to- his right hand and two fractures to his right leg), it was physically and medically impossible for him to have been run over-by a bus.
On a motion for summary judgment, it is not the function of the-trial judge to make credibility determinations. A party seeking -summary judgment is entitled to ■ a favorable judgment only if .“there is no genuine issue as. to a material fact” .and that the “mover is entitled to judgment as a matter of law.” [Emphasis added.] La. C.C.P. ’ art. 966 B. The credibility of a witness is a'question oí fact. Hutchison v. Knights of Columbus, Council No. 5747, 03-1533, p. 8. (La.2/20/04), 866 So.2d 228, 234. Additionally, the weighing of conflicting evidence has no place in summary judgment. Id: The rule that questions of credibility are for the trier of fact likewise applies to the evaluation, of expert testimony. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257, pp. 16-17 (La.2/29/00), 755 So.2d 226, 236. inflight of the conflicting evidence submitted bn the motion for summary judgment, we find the trial- judge- erred in determining that Dri - Aiken’s affidavit and expert medical summary report were úncontroverted and that they resolved all. issues of material fact regarding the RTA’s liability for Mr. Bridgewater’s accident and injuries.
The RTA next, .contends that, due to his intoxicated state at the time of the accident and his failure to be forthcoming about his alcohol intake in the Hours preceding the "accident, Mr. Bridgewater’s version of how the accident happened is unreliable and not believable.- While-the medical records support the RTA’s contention that Mr. Bridgewater may have been inebriated when the subject |anaccident occurred, our review of the exhibits, affidavits, and testimony submitted on- the motion for summary judgment also show that, at ■ all times pertinent, Mr. Bridgewater has steadfastly maintained that he was hit by a RTA 'bus and' that the injuries occasioned to his right arm and leg occurred when the RTA bus struck him.
First, according to the affidavit of the bystander, Joe Myles, on the date and at the time of the accident, while walking towards his home located on South Dorge-nois, he heard a man screaming for help. Upon reaching the man who was located on the neutral ground, it was apparent the man was injured, so Mr. Myles called 911 seeking emergency medical, assistance. Thereafter, emergency personnel and a NOPD officer arrived oh the scene, at which time Mr. Myles advised the authorities that, although he .did not witness the accident,' the injured man had been hit by a RTA bus.
, Next, according.to the Ambulance Run Report- completed by one of the emergency medical technicians who was dispatched to the scene of the accident, upon his arrival, Mr. Bridgewater was “found supine in [the] grass” and smelling of alcohol approximately four feet from the roadway. His chief complaint at that time was right-sided pain secondary to “being hit-.by a moving bus” [emphasis supplied]. The technician noted ¿ “scrape” and “deformity”" to Mr. Bridgewater’s right knee cap.
Officer Smith, the NOPD officer assigned to investigate Occidents involving RTA Ruses including Mr. Bridgewater’s accident, stated in his report, which was prepared- on the same day the accident occurred, that he received a call from the RTA dispatcher advising that a person had possibly been hit by a RTA bus. When he arrived at the accident scene, Officer Smith observed emergency personnel [^attending to Mr. Bridgewater in a small grassy area adjacent to the'street. Mr. *421 Bridgewater reported to Officer Smith that “he was sitting on the sidewalk at the location in question when an [sic] RTA bus turned too short and hit him” [emphasis supplied]. Prior to transporting Mr. Bridgewater via ambulance to the emergency room at Charity Hospital, the emergency medical technician advised Officer Smith that Mr. Bridgewater had sustained a possible broken or fractured leg.
When he arrived in the emergency room, Mr. Bridgewater presented with a history of right arm and right leg pain “after having been struck by a bus ” [emphasis added]. On examination, swelling was seen over the femur and tibia of his right leg and’ a mild deformity was evidenced at the right knee; x-rays showed a “high patella” or “displaced” patella.
Over the span of several hours, and having had to recount to several different persons regarding how and what happened to him, despite his alleged inebriated state, Mr. Bridgewater did not waver from his version of what happened: his right arm and leg were injured when he was run over by a RTA bus. In the weeks and months that followed, his recollection of how he acquired his injuries did not change. Accordingly, based on the record before us, we find that reasonable minds could differ as to whether Mr. Bridgewa-ter’s purported inebriated condition tainted his ability to accurately recall the events that allegedly occurred on the date of the accident precluding summary judgment in favor of the RTA on the issue of liability for the accident.
Based upon our de novo review of the record, in light of the conflicting evidence submitted, we find as a matter of law that Mr. Bridgewater is entitled to a trial on the merits regarding the issue of the RTA’s liability for the accident and his 122injuries. Accordingly, we reverse the trial court’s granting of summary judgment in favor of the RTA on the issue of liability and remand the matter to the trial court for further proceedings. Moreover, finding merit to Mr. Bridgewater’s appeal of the trial court’s judgment, we deny the RTA’s request for attorney’s fees and costs for the filing of. a frivolous appeal. His appeal is obviously not frivolous.

CONCLUSION

For the foregoing reasons, we affirm that portion of the trial court’s judgment denying Mi. Bridgewater’s motion for rehearing of the 'judgment granting the City’s motion for summary judgment; we reverse that portion of the judgment granting .the RTA’s motion for summary judgment’ on the issue of liability; and, remand the matter to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
■ APPENDIX “A”
*422 [[Image here]]
BONIN, J., concurs in the results only.

.. See attached Appendix "A.”

. Joe-A. Myles, a resident of Texas, is currently serving as a sergeant with the Texas Army National Guard.

. According to the emergency room records from Charity Hospital in evidence,. Mr. Bridgewater was treated for a right non-displaced trapezium fracture and a non-displaced fracture át the base of the second metacarpal with intra-articular extension. He was fitted with a right hand and wrist cast. Additionally, Mr. Bridgewater was also treated for a scrape to his right knee.

. Mr. Bridgewater alleged that TMSEL- was “engaged in a partnership or joint venture" with the RTA "to provide bus service for profit in the City.”

. La. C.C.P. art. 966 was amended in 2013, 2014, and 2015. These amendments are-not implicated in the issues presented in this appeal.

. La. R.S. 9:2800 provides, in pertinent part:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within • its' care and custody. *
B. Where other constructions. are placed upon state property by someone other than the state, and the right to keep the improvements on the property has expired, the state shall not be responsible for any damages caused thereby unless the state affirmatively takes control of and utilizes the improvement for the state's benefit and use.
C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public, entity has had a reasonable opportunity, to remedy the defect and has failed to do so.
D.Constructive notice shall riiean the existence of facts which infer actual knowledge,
» H« ¾« ⅜ ■ ⅝«
G. (1) "Public entity” means and includes that state and any of its branches, departments, offices, agencies ... employees, and political subdivisions and the departments, offices .... officers, officials; and employees of such subdivisions....
(2) "Public site or area” means any publicly owned or common thing ... which the public’s access is not prohibited, limited, or restricted in some manner including those areas of unrestricted access such as streets, sidewalks, parks, or public squares. .

. In order for a hazard to be considered "open and obvious,” the hazard should be one that is open and obvious to all, i.e., everyone who may potentially encounter it. Broussard v. State ex rel. Office of State Bldgs., 12-1238, p. 10, 113 So.3d at 184. If the facts and circumstances presented indicate a dangerous condition that should be open and obvious to everyone who encounters ⅛ then the defendant owes no' duty to the plaintiff to warn ¿gainst it. Id.

. La. R.S. 32:398 D provides, in pertinent part;
It shall be the duty_of the police department of each city or town to investigate all accidents required to be reported by this Section when the áccidénts occur within the corporate limits of the city or town. Every law enforcement officer whoinvesti-gates an accident, as required by this Subsection, shall instruct the driver or each vehicle involved in the accident to report the following to all parties suffering injury or property damage as an apparent result of the accident:
(1) The name and address of the owner and the driver of the vehicle. The license number of the vehicle.
(2) The license number of the vehicle.
(3) The name of the liability carrier for the vehicle, the name, address, and telephone number of the insurance agent who procured the liability policy providing coverage for the vehicle.

, The report prepared by Officer Rogers identified the location of the alleged accident, the approximate time that the police dispatcher received the call notifying the NÓPD' of the accident, and listedfhe name, address, date of •birth, social security number, and telephone - numbers of the purported witness, "Mr. Joe . A. Miles or Myles.” And though the report indicates that Mr. Bridgewater was unable to ■ idéntify either the bus involved or its driver (contrary to Mr. Bridgewater⅛ testimony that ' he told Officer Rogers that the bus involved was the "Louisiana Avenue Bus 27”), the report clearly states that Mr. Bridgewater claimed to have been hit by a RTA bus. The report further indicates Officer Rogers was advised by emergency personnel on the scene that "Mr. Bridgewater had [sustained] a possible brokén or fractured” leg.

. An ''occult” fracture, sometimes referred to as a "hidden” fracture, is a fracture that cannot be detected by radiographic examina-tiop until several weeks after injury. It is accompanied by the usual signs of pain and trauma and may produce soft tissue edema • (swelling), similar to' the edema noted on the report of Mr. Bridgewater's ¿ray. Magnetic resonance imaging, .such as that recommended by the reviewing radiologist on the date of Mr, Bridgewater's accident, may be used to confirm a suspected occult fracture before changes are evident on radiography two to four weeks later. See Mosby’s Medical Dictionary, "occult fracture,” 8th Edition (2009); Farlex Partner Medical Dictionary, "occult fracture," (2012).

. Our research indicates that it is not altogether uncommon for different radiologists reviewing the same x-rays to reach differing conclusions regarding the presence of a fracture or for the occurrence of a fracture to reveal itself in subsequent x-rays. In Giammanchere v. Ernst, 96-2458, pp. 2-3 (La.App, 4 Cir. 5/19/99), 742 So.2d 572, 574, the plaintiff fell as she exited Touro Infirmary.’ She was immediately transported to the emergency room where hip x-rays were, obtained. The treating physician examined the x-rays and determined the plaintiff had suffered sprained muscles in the left hip and she was discharged. Later, a Touro radiologist reviewed the films and discovered a hip fracture. Several weeks later, due to the plaintiff’s continued complaints of extreme pain, additional x-rays were obtained evidencing the hip fracture.
Similarly, in Shah v. Jefferson Parish Hospital District No. 2 Parish of Jefferson, 03-1465, pp. 1-2 (La.App. 5 Cir. 4/13/04), 870 So.2d 597, 598-599, the plaintiff presented to the emergency room of East Jefferson General Hospital complaining of pain in his left hip after falling off of a ladder. The emergency room physician ordered an x-ray of the hip which was read by the radiologist as being negative for fracture. The plaintiff, was discharged with a diagnosis of a thigh sprain and contusion of the left hip. Several weeks later, due to continued complaints of hip pain, a second x-ray was obtained by another physician. On this occasion, the plaintiff was diagnosed as having sustained a left femoral hip fracture,
Likewise, in Baloney v. Carter, 387 So.2d 54 (La.App. 4th Cir.1980), the plaintiff was brought to the emergency room at East Jefferson Hospital following an automobile accident complaining of pain in . both of her legs and a laceration of her right elbow. On examination, the plaintiff exhibited a full range of motion. Despite complaints of- pain in both legs and her right hip, x-rays of her left knee were obtained and read as showing no fracture. She was discharged with a diagnosis of right hip and leg sprain and left knee sprain. Several days later, due to ongoing complaints of pain, the plaintiff was admitted to. Ochsner Hospital and treated for what turned out to be a fractured pelvis and a. fractured right leg.
In Ketchum v. Roberts, 12-1885 (La.App. 1 Cir. 5/29/14), 2014 WL 3510694, an unpublished opinion, the plaintiff was taken to the emergency room at St. Tammany Hospital following an automobile accident. Upon arrival, several tests and x-rays were ordered, including x-rays of her left ankle; which when read by the treating physician, did not reveal any fractures. Consequently, the plaintiff was diagnosed with an ankle sprain and was fitted with a gel splint and discharged with instructions to follow-up with her primary care physician for her ankle injury (as well as with a neurologist due to a possible seizure). Several days after the accident, pursuant to the hospital's policy, the x-rays of the plaintiff’s ankle were forwarded to St. Tammany's radiology department for review. At that time, contrary to the initial findings of the emergency room physician, the reviewing radiologist determined that the plaintiff’s anide was not sprained, but rather/ was actiially fractured in three places. ’